# 24-2865 (L)

## 24-2928 (XAP)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

UMB BANK, N.A., solely in its capacity as Trustee under the Contingent Value Rights Agreement by and between Bristol−Myers Squibb Company and Equiniti Trust Company, dated November 20, 2019,

*Plaintiff-Appellant and Cross-Appellee*,

v.

BRISTOL-MYERS SQUIBB COMPANY,

*Defendant-Appellee and Cross-Appellant.*

On Appeal from the United States District Court for the Southern District of New York

**BRIEF & SPECIAL APPENDIX FOR UMB BANK, N.A. [REDACTED]**

Philippe Z. Selendy
Maria Ginzburg
Sean P. Baldwin
Joshua S. Margolin
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000

Jeffrey A. Lamken
*Counsel of Record*
Eugene A. Sokoloff
Harry P. Larson
Caroline A. Veniero
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com

*Counsel for Plaintiff-Appellant and Cross-Appellee*

*(Additional Counsel Listed on Inside Cover)*

David Andrew Crichlow
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, NY 10020
(212) 940-8941

*Additional Counsel for Plaintiff-Appellant and Cross-Appellee.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Appellant UMB Bank, National Association, states that its corporate parent is UMB Financial Corporation. UMB Financial Corporation, a publicly held corporation, owns 100 percent of UMB Bank, National Association.

March 13, 2025

/s/ Jeffrey A. Lamken
Jeffrey A. Lamken

# TABLE OF CONTENTS

Page


INTRODUCTION ..... 1

JURISDICTIONAL STATEMENT ..... 4

ISSUES PRESENTED ..... 4

STATEMENT OF THE CASE ..... 5

I. Bristol-Myers Mismanages the Approval Process for Liso-Cel, Avoiding a $6.7 Billion Payment to CVR Holders ..... 6

A. Bristol-Myers Botches the Liso-cel Application ..... 6

B. Bristol-Myers Fails To Prepare Liso-cel Manufacturing Facilities ..... 8

II. The CVR Holders Appoint UMB To Vindicate Their Rights Under the CVR Agreement ..... 10

A. A Majority of Holders Appoints a New Trustee ..... 10

B. Bristol-Myers Is Notified That the Signatories Were Beneficial (Not Registered) Holders ..... 11

C. Bristol-Myers Declares UMB the New Trustee ..... 13

III. Proceedings Below ..... 14

A. UMB Sues Bristol-Myers on Behalf of CVR Holders ..... 14

B. The Trial Court Denies Bristol-Myers' First Motion To Dismiss; Bristol-Myers Answers ..... 15

C. After More Than Two Years of Litigation, Bristol-Myers Asserts for the First Time That UMB Lacks Article III Standing ..... 16

D. The District Court Dismisses for Lack of Article III Standing ..... 18

E. Proceedings Since Dismissal....20

SUMMARY OF ARGUMENT....21

STANDARD OF REVIEW....24

ARGUMENT....24

I. Bristol-Myers' Challenge to UMB's Contractual Authority Has No Bearing on Subject-Matter Jurisdiction....26

A. A Party's Authority To Sue Under a Contract Does Not Implicate Article III Standing....27

B. The Undisputed Injury to CVR Holders Satisfies Article III....31

C. Reversal Must Follow....33

D. The District Court's Contrary Characterization Defies Settled Law....36

II. UMB Had Authority To Sue Whether or Not the Issue Is Jurisdictional....39

A. Bristol-Myers Endorsed, Ratified, and Waived Any Objection to UMB's Appointment with Full Awareness of the Facts It Now Claims Render That Appointment Ineffective....39

B. Equiniti Reasonably Determined, Without Objection, That UMB Was Validly Appointed....47

C. The Purported Defects Are Insufficient To Overturn UMB's Appointment....53

D. The District Court's Contrary Analysis Falls Short of Justification....54

1. The District Court Was Not Free To Ignore the State-Law Obstacles to Bristol-Myers' Arguments....55

2. The District Court's Own Findings Demonstrate That Bristol-Myers Relinquished Any Challenge to UMB's Appointment....57

CONCLUSION....62

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re Adelphia Recovery Tr.*,
634 F.3d 678 (2d Cir. 2011) ....................................................................45

*Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aire*s,
415 F.3d 242 (2d Cir. 2005) ..............................................................*passim*

*Bank of N.Y. Mellon Tr. Co., N.A., v. Morgan Stanley Mortg. Cap., Inc.*,
821 F.3d 297 (2d Cir. 2016) ....................................................................53

*Bank of N.Y. v. BearingPoint, Inc.*,
824 N.Y.S.2d 752 (N.Y. Sup. Ct. 2006)...................................................57

*In re Bankers Tr.*,
403 F.2d 16 (7th Cir. 1968) .....................................................................46

*Brown v. Keller*,
274 F.2d 779 (6th Cir. 1960) ...................................................................30

*Carter v. HealthPort Techs., LLC*,
822 F.3d 47 (2d Cir. 2016) .......................................................................24

*Commerzbank AG v. U.S. Bank, N.A.*,
100 F.4th 362 (2d Cir. 2024) ..............................................................31, 36

*Crocker-Citizens Nat'l Bank v. Younger*,
481 P.2d 222 (Cal. 1971).........................................................................46

*In re Dakin's Will*,
296 N.Y.S.2d 742 (N.Y. Surr. 1968).......................................................46

*De Saracho v. Custom Food Mach., Inc.*,
206 F.3d 874 (9th Cir. 2000) ...................................................................34

*Doe v. Menefee*,
391 F.3d 147 (2d Cir. 2004) ....................................................................60

*Sam M. ex rel. Elliott v. Carcieri*,
608 F.3d 77 (1st Cir. 2010).....................................................28, 29, 30, 31

*T.W. ex rel. Enk v. Brophy*,
124 F.3d 893 (7th Cir. 1997) ........................................................................*passim*

*Evans v. Famous Music Corp.*,
807 N.E.2d 869 (N.Y. 2004)..............................................................................51

*Firestone v. Galbreath*,
976 F.2d 279 (6th Cir. 1992) .....................................................................28, 29

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
991 F.3d 370 (2d Cir. 2021) ........................................................................*passim*

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*,
850 N.E.2d 653 (N.Y. 2006).......................................................................47, 62

*Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*,
647 N.E.2d 1329 (N.Y. 1995)............................................................................62

*Hadden v. Consol. Edison Co. of N.Y.*,
312 N.E.2d 445 (N.Y. 1974)..............................................................................53

*In re Irrevocable Tr. of McKean*,
183 P.3d 317 (Wash. Ct. App. 2008)..................................................................46

*Jacob & Youngs v. Kent*,
129 N.E. 889 (N.Y. 1921)..................................................................................53

*Kamco Supply Corp. v. On the Right Track, LLC*,
49 N.Y.S.3d 721 (2d Dep't 2017).......................................................................44

*Klevanow v. N.Y. Produce Exch.*,
344 F.2d 294 (2d Cir. 1965) ..............................................................................34

*Kowalski v. Tesmer*,
543 U.S. 125 (2004)...........................................................................................36

*Lantau Holdings Ltd. v. Gen. Pac. Grp. Ltd.*,
163 A.D.3d 407 (1st Dep't 2018) .......................................................................57

*In re Levy*,
893 N.Y.S.2d 142 (2d Dep't 2010).....................................................................45

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................................................................................32

*Machne Menachem, Inc. v. Hershkop*,
No. 97-cv-2550, 2001 WL 984943 (E.D.N.Y. July 24, 2001) ..........................34

*Mackensworth v. S.S. Am. Merchant*,
28 F.3d 246 (2d Cir. 1994) ..........................................................................24

*Murray Bresky Consultants, Ltd. v. N.Y. Comp. Manager's Inc.*,
968 N.Y.S.2d 595 (3d Dep't 2013)................................................................46

*Norris v. Causey*,
869 F.3d 360 (5th Cir. 2017) ........................................................................30

*Polymer Tech. Corp. v. Mimran*,
975 F.2d 58 (2d Cir. 1992) ..........................................................................61

*RACER Tr. v. Nat'l Grid USA*,
10 F.4th 87 (2d Cir. 2021) ..........................................................................29

*Rebecca Broadway Ltd. P'ship v. Hotton*,
143 A.D. 3d 71 (1st Dep't 2016) ..........................................................45, 57

*Richmor Aviation, Inc. v. Sportsflight Air, Inc.*,
918 N.Y.S.2d 806 (3d Dep't 2011)................................................................45

*Rideau v. Keller Indep. Sch. Dist.*,
819 F.3d 155 (5th Cir. 2016) ...................................................................28, 29

*Rizzo v. Means Servs., Inc.*,
632 F. Supp. 1115 (N.D. Ill. 1986)................................................................55

*Rothschild v. Title Guar. & Tr. Co.*,
97 N.E. 879 (N.Y. 1912)..............................................................................45

*SM Kids, LLC v. Google LLC*,
963 F.3d 206 (2d Cir. 2020) ...................................................................27, 28

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
554 U.S. 269 (2008)...............................................................................28, 38

*Swaim v. Moltan Co.*,
73 F.3d 711 (7th Cir. 1996) ....................................................................34

*Thole v. US Bank N.A.*,
590 U.S. 538 (2020).....................................................................................32

*United States v. Willis*,
14 F.4th 170 (2d Cir. 2021) ........................................................................60

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
549 F.3d 100 (2d Cir. 2008) .................................................................24, 25, 28

**Statutes And Rules**

28 U.S.C. § 1291 ..................................................................................................4

28 U.S.C. § 1332 ..................................................................................................4

Fed. R. Civ. P. 12(b)(2).......................................................................................35

Fed. R. Civ. P. 12(g)(2).......................................................................................35

Fed. R. Civ. P. 12(h)(1).......................................................................................35

Fed. R. Civ. P. 12(h)(1)(A) .................................................................................35

Fed. R. Civ. P. 17(a)(1).......................................................................................30

N.Y. Uniform Comm. Code § 8-506 (2024)....................................................12, 53

**Other Authorities**

5C Charles Alan Wright & Arthur R. Miller, Federal Practice and
Procedure §§ 1391, 1394 (3d ed. 2004)..........................................................35

13A Charles Alan Wright & Arthur R. Miller, Federal Practice and
Procedure § 3531.9.6 (3d ed. 2008) .................................................................28

David Brooks, *Depository Trust Company and the Omnibus Proxy: Shareholder Voting in the Era of Share Immobilization*, 56 S. Tex.
L. Rev. 205 (2014) ..............................................................................................12

Depository Trust Company, Operational Arrangements (2024),
https://www.dtcc.com/legal/rules-and-procedures.aspx...................................42

FDA, *What Are "Biologics" Questions and Answers*, https://www.fda.gov/about-fda/center-biologics-evaluation-and-research-cber/what-are-biologics-questions-and-answers....................................6

Fed. R. Civ. P. 12 advisory committee's note to 1966 amendment...........................35

Restatement (Second) of Contracts (Am. L. Inst. 1981) ..................................44, 54

13 Williston on Contracts § 39:31 (4th ed. 2024) ..................................................44

## INTRODUCTION

When Bristol-Myers Squibb bought Celgene—a pharmaceutical company with a pipeline of promising therapies nearing FDA approval—Bristol-Myers paid in part with "contingent value rights" or "CVRs." Those CVRs would pay out $6.7 billion if (and only if) Bristol-Myers secured FDA approval for three acquired pipeline therapies by certain "milestone" dates. Two therapies were approved on time. The third was approved 36 days late, and Bristol-Myers paid nothing. That narrow miss was not merely avoidable; it was inexcusable. Despite its express obligation to use "diligent efforts" to meet the milestone dates, Bristol-Myers withheld vital information from the FDA, submitted defective responses to FDA follow-up requests, and failed to prepare its manufacturing facilities for FDA inspections.

Under the agreement governing the CVRs, CVR holders generally could vindicate their rights only through a Trustee. Concerned that the incumbent Trustee, Equiniti Trust Company, lacked litigation experience, a majority of CVR holders decided to appoint Appellant UMB Bank, N.A., instead. They submitted an Instrument of Removal, Appointment, and Acceptance ("Instrument") along with documentation of their holdings. After reviewing those materials with Bristol-Myers' counsel, Equiniti concluded that the Instrument was effective. Bristol-Myers endorsed that determination: In a notice to all CVR holders, it declared that Equiniti had been "removed" and UMB "appointed [as] successor Trustee."

UMB then filed this suit as Trustee. Bristol-Myers, UMB alleged, breached its obligation to use diligent efforts to secure FDA approval and left CVR holders empty-handed—depriving them of $6.7 billion—as a result. Discovery uncovered increasingly damning evidence of Bristol-Myers' breaches. So, years into the suit, Bristol-Myers changed its position. Despite having repeatedly told CVR holders and the world that UMB was the Trustee, Bristol-Myers asserted for the first time that a defect in UMB's appointment deprived UMB of Article III standing.

According to Bristol-Myers, the Instrument appointing UMB had been executed by a majority of the CVRs' ***beneficial*** holders. The CVR Agreement, Bristol-Myers asserted, required execution by the CVRs' ***registered*** holders—even though Bristol-Myers approved UMB's appointment knowing the Instrument was signed by beneficial holders; even though Bristol-Myers had notified CVR holders and the world that UMB had been appointed the Trustee; even though the beneficial holders are the investors with the real economic interest in the CVRs; and even though the registered holder of 99.9%-plus of CVRs was the Depository Trust Company, a bookkeeper that acts only at the beneficial holders' direction. Bristol-Myers also objected that the signatories' holdings had been counted as of 9 days before UMB delivered the Instrument to Equiniti and Bristol-Myers. But Bristol-Myers had known that, too.

Bristol-Myers' effort to transform its untimely and waived contractual objection to UMB's appointment into a jurisdictional Article III standing issue should have been rejected out of hand. Once Bristol-Myers declared that UMB was the Trustee—which it did before UMB filed suit—UMB ***had*** authority to proceed as the Trustee. Period. Whether one says Bristol-Myers "waived" a condition or "ratified" the appointment, recognizes the purported defect is immaterial, or rejects Bristol-Myers' construction of the contract, UMB was the Trustee at least from that announcement forward.

Regardless, Bristol-Myers' contractual challenge to UMB's appointment does not implicate UMB's ***constitutional standing***. Under settled precedent, a case or controversy exists "so long as ***a*** party with standing to prosecute the specific claim in question exists at the time the pleading is filed"—***even if*** that party is not the named plaintiff. *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 386 (2d Cir. 2021) (emphasis added); *see T.W. ex rel. Enk v. Brophy*, 124 F.3d 893, 896 (7th Cir. 1997) ("Even allowing a complete stranger to bring suit" on an injured party's behalf "would not violate Article III."). Here, UMB sued to redress injuries to CVR holders. Those holders plainly satisfy the constitutional requirements of standing: They suffered a $6.7 billion injury-in-fact, traceable to Bristol-Myers' breaches of the CVR Agreement, and redressable by a favorable merits ruling. Whether UMB had ***contractual authority*** to vindicate the holders' rights under the CVR Agreement has nothing to do with "the requirements found within

Article III." *Fund Liquidation*, 991 F.3d at 382. Like any other contractual condition, it could be (and was) waived, forfeited, or fixed. The district court's decision dismissing for lack of subject-matter jurisdiction should be reversed.

## **JURISDICTIONAL STATEMENT**

The district court had jurisdiction under 28 U.S.C. § 1332. The court entered judgment on September 30, 2024. UMB timely filed its notice of appeal on October 29, 2024. This Court has jurisdiction under 28 U.S.C. § 1291.

## **ISSUES PRESENTED**

Concerned that Bristol-Myers had breached its contractual obligations—and deprived them of billions of dollars—a majority of CVR holders decided to replace their existing Trustee and appoint one equipped to pursue litigation. The incumbent Trustee, Equiniti, exercised its contractual obligation to assess whether a majority of securities-holders had appointed UMB to replace it and determined that they had. Bristol-Myers, the other party to the governing agreement, independently reviewed the Instrument appointing UMB, accepted Equiniti's determination, and publicly declared UMB the new Trustee. This lawsuit followed. The issues presented on appeal are:

1. Whether Bristol-Myers' contract-based challenge to UMB's appointment—made long after Bristol-Myers itself announced that appointment—implicates Article III standing, where there is no dispute that the CVR holders on

whose behalf UMB sued satisfy constitutional standing requirements, including (a) injury-in-fact, (b) traceable to Bristol-Myers' conduct, and (c) redressable by the claims asserted in this suit.

2. Whether, even if the issue were jurisdictional, UMB became Trustee—and Bristol-Myers surrendered any ability to contest its appointment—when Bristol-Myers declared UMB the Trustee, with full knowledge of the facts it now claims rendered that appointment ineffective.

3. Whether UMB was properly appointed, where the incumbent trustee exercised its authority under the CVR Agreement to determine that the Instrument appointing UMB was valid and effective.

## STATEMENT OF THE CASE

In January 2019, Bristol-Myers announced it was acquiring one of its competitors, Celgene. JA25-26(¶3). Bristol-Myers paid for that acquisition with a mix of cash, Bristol-Myers shares, and a type of security called a contingent value right or "CVR." JA37(¶36). This case arises from Bristol-Myers' failure to pay the billions it owes CVR holders under the CVR Agreement. The district court (Furman, J.) denied Bristol-Myers' first motion to dismiss for failure to state a claim. JA123. Two years after UMB sued, Bristol-Myers asserted, for the first time, that a purported defect in UMB's appointment deprived UMB of Article III standing. JA192. The court accepted that argument and dismissed UMB's complaint. SPA31.

## I. Bristol-Myers Mismanages The Approval Process For Liso-Cel, Avoiding A $6.7 Billion Payment To CVR Holders

Bristol-Myers agreed to pay $9 for each CVR it issued (a total of approximately $6.7 billion) if—and only if—the FDA approved three groundbreaking therapies in Celgene's pipeline by specified "milestone" dates. JA25-26 (¶3), JA35 (¶32).[1] The agreement governing the CVRs required Bristol-Myers to "use Diligent Efforts" to meet those deadlines. JA98 (§ 7.8). But Bristol-Myers did not hold up its end of the bargain. Bristol-Myers repeatedly botched the process. As a result, it missed the milestone date for one therapy, a treatment for non-Hodgkin's lymphoma called lisocabtagene maraleucel ("liso-cel"). JA24 (¶1), JA35 (¶¶31-32).

### A. Bristol-Myers Botches the Liso-cel Application

To secure final FDA approval of a "biologic therapy" like liso-cel, manufacturers must submit Biologic License Applications. JA40 (¶44).[2] Celgene submitted the initial components of the liso-cel application before the merger took effect. JA40-41 (¶46). But Bristol-Myers was responsible for the critical Chemistry, Manufacturing, and Controls ("CMC") module that details chemistry, manufacturing method, and the controls used to ensure safety and effectiveness. JA40-41 (¶46).

---

[1] There are an estimated 743,914,518 Outstanding CVRs. *See* JA659-60.

[2] Unlike drugs, which ordinarily are chemically synthesized, biologics are therapies derived from natural sources, such as humans, animals, or microorganisms. *See* FDA, *What Are "Biologics" Questions and Answers*, https://www.fda.gov/about-fda/center-biologics-evaluation-and-research-cber/what-are-biologics-questions-and-answers.

The FDA reviewed the completed liso-cel application on February 13, 2020 and granted it Priority Review status, putting the therapy on track for approval by August 17, 2020—well before the December 31, 2020 milestone date. JA40-42 (¶¶ 46-50). But the FDA soon uncovered a serious problem: Bristol-Myers had inexplicably omitted critical data and analysis from the application's CMC module. JA40-41 (¶ 46), JA43 (¶ 52). When Bristol-Myers supplemented its submission, the FDA deemed the new information a "major amendment" to the application. JA43 (¶ 53). That determination automatically pushed the FDA's decision date out by three months to November 16, 2020—about 45 days before the liso-cel milestone. JA43 (¶ 53).

The major-amendment determination shocked markets. Major amendments, and the corresponding delays, are rare. Of the therapies approved in 2018 and 2019, about 12.5% had major amendments. JA44 (¶ 55). The rate was far lower for applications with Priority Review, like liso-cel. From 2014 to 2018, just 7.5% of New Drug Applications (the drug equivalent of a biologic license application) required a major amendment. JA44 (¶ 55). The CVRs, formerly trading at $4.50, fell to $3. JA44 (¶ 56).

Bristol-Myers' own employees were not so surprised. [redacted] JA1085-86 (Tr. 110:4-9, 114:9-11), JA1139. [redacted]

[redacted] JA1143. [redacted] JA1143. [redacted]

JA1142; *see* JA1096-97 (Tr. 108:5-10, 148:6-9).

### B. Bristol-Myers Fails To Prepare Liso-cel Manufacturing Facilities

Bristol-Myers also flunked the FDA's standard Pre-License Inspections of the facilities where Bristol-Myers intended to manufacture liso-cel: the "Juno" facility in Washington, and the "Lonza" facility in Texas. JA46-48 (¶¶ 61, 63-65).

Bristol-Myers had ample notice the inspections were coming. Pre-License Inspections are scheduled in advance. JA47 (¶ 64). Although inspections of Juno and Lonza were initially slated for the first half of 2020, they did not occur until October and December 2020, respectively, affording Bristol-Myers even more time to prepare. JA46-47 (¶¶ 62-63). With full notice about [redacted], JA1130 (Tr. 273:15-21), Bristol-Myers failed to take even basic steps [redacted], JA47 (¶ 64).

The FDA's inspection of the Juno facility was a fiasco. The FDA documented a host of failures. JA48 (¶65). Inspectors found that [redacted]. JA1203-07. Bristol-Myers failed to establish "procedures at the Juno Facility designed to prevent contamination of sterile drug products" or "procedures to ensure drugs conformed to appropriate standards of identity, strength, quality, and purity." JA48 (¶66(a)-(b)). Bristol-Myers' response to the investigators' findings was so deficient that the FDA required Bristol-Myers to prepare a supplemental response. JA48-49 (¶67). By the time Bristol-Myers was done, two months had passed since the inspection, and the December 31, 2020 milestone date for liso-cel was days away. JA48-49 (¶67).

The Lonza inspection was similarly catastrophic. The FDA's report for Lonza found that Bristol-Myers had not taken steps "to prevent mix-ups" in the storage of various materials, including materials "rejected" on quality control grounds that were cleared only for "non-clinical use." JA50 (¶71), JA462. A freezer where other materials were stored was "poorly maintained and organized" with bottles of "overturned" [redacted] covered in frost. JA50 (¶71), JA462, JA1209. Certain "incoming . . . raw materials" were "not tested to confirm identity" before being released "for manufacturing." JA49-50 (¶¶69-71), JA463. Essentials like

"[m]icrobial contamination controls" were "not adequate." JA49-50 (¶ 69), JA464. And like its response to the FDA's report on Juno, Bristol-Myers' response for Lonza was deficient, requiring Bristol-Myers to submit further supplementation. JA51 (¶ 72).

## II. THE CVR HOLDERS APPOINT UMB TO VINDICATE THEIR RIGHTS UNDER THE CVR AGREEMENT

With the clock running out on the liso-cel milestone, CVR holders grew concerned Bristol-Myers would miss the milestone and refuse to pay the $6.7 billion it otherwise owed. Ordinarily, only the CVR Trustee can sue for breach of the CVR Agreement (including the "Diligent Efforts" obligation). JA103 (§ 8.6). But the initial Trustee, Equiniti, had "never" sued "on behalf of beneficiaries of a trust." JA484-85 (Tr. 37:23-38:6). Accordingly, holders of a majority of the outstanding CVRs joined together to replace Equiniti with UMB.

### A. A Majority of Holders Appoints a New Trustee

Under the CVR Agreement, a Trustee may be removed, and a new Trustee appointed, by an "act of the Majority Holders." JA90-91 (§ 4.10(c), (e)). On December 18, 2020, UMB presented Equiniti and Bristol-Myers with an Instrument removing Equiniti. The Instrument was executed by a majority of the outstanding CVRs' "beneficial" holders—the investors who held CVRs in their portfolios and stood to lose billions of dollars as a result of Bristol-Myers' breaches. JA335-42.

Bristol-Myers' legal department and its outside counsel reviewed the Instrument and the CVR Agreement's requirements. JA559-63 (Tr. 42:23-46:15). Bristol-Myers asked Equiniti to "confirm" whether UMB "did in fact get the required 50% of CVR holders for the trustee change." JA347. Equiniti confirmed that it had. JA346. Bristol-Myers then asked Equiniti to obtain "all evidence of the Holders' ownership" in the outstanding CVRs. JA345. UMB obliged, sending account statements showing the number of CVRs beneficially held by each of the signatories as of December 9. JA388-91; *see* JA493 (Tr. 162:7-21). After reviewing this documentation, Equiniti again confirmed that the signatories held a majority of CVRs. JA386-88.

### B. Bristol-Myers Is Notified That the Signatories Were Beneficial (Not Registered) Holders

Under the CVR Agreement, an "act" of the CVR "Holders"—such as removal and appointment of the Trustee—"may be embodied in and evidenced by" a written instrument "signed by such Holders in person or by an agent duly appointed in writing." JA75 (§ 1.4(a)). Although the Agreement generally defines a "Holder" as "a Person in whose name a Security is registered," Equiniti, as incumbent Trustee, had discretion to determine what counted as a signature of a "Holder." JA70 (§1.1). Section 1.4(b) provides that "[t]he fact and date of the execution by any Person" of an "instrument" embodying a purported act "may be proved in any reasonable manner ***which the Trustee deems sufficient***." JA76 (§ 1.4(b)) (emphasis added).

"Proof of execution of any such instrument," in turn, is "sufficient" to render the instrument effective, and (subject to limited exceptions), "conclusive in favor of the Trustee and the Company." JA75 (§1.4(a)); *see* JA92 (§4.11(a)). Equiniti determined that the signatures of the CVRs' beneficial holders were "sufficient" proof that the Instrument had been duly "executed."

The "registered" holder for nearly all the CVRs—as with virtually every publicly traded U.S. security—was an entity called Cede & Co. as nominee of the Depository Trust Company ("DTC"). JA69 (§1.1) ("Depositary"), JA82 (§3.5(a)); *see* David Brooks, *Depository Trust Company and the Omnibus Proxy: Shareholder Voting in the Era of Share Immobilization*, 56 S. Tex. L. Rev. 205 (2014). DTC is, as its name suggests, a mere depository—effectively, an electronic filing cabinet. It holds the physical security certificates registered with the security's issuer. *See* Brooks, *supra*, at 209-10. When investors buy and sell DTC-registered securities, they trade ***beneficial*** ownership of those securities. *Id.* at 210-11. DTC records those transactions as book entries but continues to hold the certificates. Thus, although DTC remains the securities' ***registered*** holder, it holds certificates "for the benefit of the beneficial owners." JA113 (Annex A). By law, DTC cannot exercise a registered holder's rights except at the beneficial holders' direction. N.Y. Uniform Comm. Code § 8-506; JA665-66. Equiniti's decision to accept beneficial holders'

signatures on the Instrument appointing UMB thus allowed those holders to speak directly, rather than through DTC as intermediary.

Bristol-Myers was aware that a majority of beneficial, not registered, holders had effectuated UMB's appointment. Equiniti told Bristol-Myers from the start that "***[n]one of the shareholders listed" on the Instrument "[we]re registered holders.***" JA346 (emphasis added). Bristol-Myers independently reviewed the signatories' account statements showing beneficial ownership. *See* JA344-46, JA386-91. Having established that those documents reflected holdings of the beneficial holders, not DTC, Bristol-Myers nonetheless told Equiniti that it "would look to [Equiniti] as current Trustee for final confirmation regarding the majority ownership needed to change the Trustee." JA387. Equiniti provided that confirmation. JA394.

### C. Bristol-Myers Declares UMB the New Trustee

On January 4, 2021, Bristol-Myers declared UMB the new Trustee. In a notice signed by its Corporate Secretary and sent to all CVR holders, Bristol-Myers announced that "the holders of not less than 50% of the outstanding CVRs ***have removed the Trustee***, Equiniti Trust Company, and ***appointed a successor Trustee, UMB Bank, National Association***." JA394 (emphasis added).

Bristol-Myers never withdrew that announcement. To the contrary, it repeatedly reaffirmed that understanding, publicly referring to UMB in securities filings

as the "successor trustee under the CVR Agreement" again, JA525 (February 2023), again, JA529 (July 2023), and again, JA533 (October 2023).

## III. PROCEEDINGS BELOW

### A. UMB Sues Bristol-Myers on Behalf of CVR Holders

Upon appointment as Trustee, UMB launched an investigation into Bristol-Myers' conduct. On December 29, 2020 (before the liso-cel milestone had passed), UMB notified Bristol-Myers that it was exercising its right under the CVR Agreement to inspect Bristol-Myers' books and records. JA51-52 (¶75). Bristol-Myers refused to allow inspection. Instead, Bristol-Myers announced that its obligations under the CVR Agreement had terminated automatically once Bristol-Myers missed the liso-cel milestone. JA52-53 (¶77).

UMB filed this lawsuit six months later in the Southern District of New York. JA1. UMB's complaint alleged, among other things, that Bristol-Myers had repeatedly delayed the approval process by failing to include essential information in its submissions to the FDA, JA40-41 (¶46), JA43 (¶52); that it had created additional problems by delaying and botching responses to the FDA's follow-up requests, JA43 (¶53), JA48-49 (¶67); and that it had failed to take basic steps to prepare manufacturing facilities for inspection, JA48-50 (¶¶65-71). Those failures represented the opposite of the diligent efforts the CVR Agreement required. They had caused Bristol-Myers to miss the milestone deadline for liso-cel. JA56 (¶¶89-91). And

Bristol-Myers had rewarded itself for those breaches by refusing to pay CVR holders the $6.7 billion it otherwise owed them. JA32-33 (¶20).

### B. The Trial Court Denies Bristol-Myers' First Motion To Dismiss; Bristol-Myers Answers

The district court denied Bristol-Myers' initial motion to dismiss. JA123-28. The court rejected Bristol-Myers' argument that termination of the CVR Agreement barred UMB's claims, noting the Agreement expressly provides for post-termination enforcement. JA124-25. The court likewise rejected Bristol-Myers' assertion that the books-and-records requests would "interfere[]" with Bristol-Myers' "business operations" and that the damages UMB sought were not cognizable. JA127.

Bristol-Myers filed an Answer. JA129. Among other defenses, Bristol-Myers challenged the date on which CVR holders were identified. The "consents to remove Equiniti and appoint UMB Bank," it answered, "were from Holders as of the wrong record date." JA165. The Answer did not suggest that the Instrument should have been executed by "registered" holders. To the contrary, it characterized the beneficial holders' signatures as "Holder consents," objecting only to the record date. Nor did the Answer suggest that any purported defect was jurisdictional. Bristol-Myers urged only that UMB "lack[ed] capacity" to sue. JA165.

### C. After More Than Two Years of Litigation, Bristol-Myers Asserts for the First Time That UMB Lacks Article III Standing

Discovery did not go well for Bristol-Myers. It revealed a cascading series of oversights, management failures, and missteps that repeatedly pushed back liso-cel's approval. Pp. 6-10, *supra*.

Accordingly, two years into the case, Bristol-Myers argued for the first time that the purportedly defective appointment deprived UMB of the injury-in-fact necessary to support federal subject-matter jurisdiction. District Court Docket ("Dkt.") 74 at 14-15, 20. It invoked the fact that the Instrument appointing UMB (and removing Equiniti) was signed by "beneficial" (not "registered") holders. Dkt.74 at 16-19. And it again objected that the signatories' holdings had been counted as of the wrong "record date"—December 9, 2020, rather than December 18, 2020. Dkt.74 at 19.

Bristol-Myers did not dispute that it had declared UMB the Trustee months before UMB filed suit, or that Bristol-Myers knew that only "beneficial" holders had signed the Instrument when it announced UMB's appointment. Dkt.74 at 18. Nor did it dispute it had known the relevant dates. Bristol-Myers nonetheless asserted (without support) that "UMB did not disclose, and neither Equiniti nor Bristol-Myers knew, that UMB had not obtained" DTC proxies that would allow beneficial holders' signatures "to actually constitute an 'act of the Majority Holders.'" Dkt.74 at 18-19.

In response, UMB urged that any challenge to UMB's appointment was, at most, a question of contractual authority—not a threat to the court's subject-matter jurisdiction. The constitutional requirements for standing, UMB explained, were met by "the CVR holders": As the parties denied $6.7 billion by Bristol-Myers' breaches, CVR holders "have all of the hallmarks of Article III standing," including "injury[-in-fact] and redressability." JA970 (Tr. 61:14-20). Putative contractual defects in UMB's appointment went only to UMB's "capacity, its authority to assert claims ***for*** the CVR holders"—at most, a non-constitutional, non-jurisdictional "***prudential*** standing issue." JA969 (Tr. 60:1-4) (emphasis added).

Regardless, UMB had all the authority it needed. Equiniti had authority and discretion to accept signatures of beneficial holders as "sufficient" proof that the Instrument was a valid "act" of "Majority Holders." JA75 (§ 1.4(b)). Bristol-Myers also ratified UMB's appointment as Trustee—and surrendered any right to contest it—when Bristol-Myers accepted and publicly announced UMB's appointment before suit was filed. JA394. Bristol-Myers, moreover, procedurally waived its registered-holder challenge by failing to raise it at the outset of the case.

Finally, UMB argued that any defect in its appointment could be cured by obtaining DTC consent for a majority of CVRs (as UMB would have done in 2020 had Bristol-Myers or Equiniti raised any putative defect then). Indeed, while the motion was pending, UMB obtained DTC authorizations approving UMB's appoint-

ment as Trustee from more than 50% of outstanding CVRs as of both December 9 and December 18, 2020. JA659. UMB urged that these re-confirmations mooted Bristol-Myers' contractual challenge to UMB's appointment, and that the injury-in-fact suffered by beneficial holders was sufficient to support constitutional standing regardless. JA673.

### D. The District Court Dismisses for Lack of Article III Standing

The district court granted Bristol-Myers' motion and dismissed the case for lack of subject-matter jurisdiction. SPA13. Under the CVR Agreement, the court stated, a trustee may be removed or appointed only by an "'act of the Majority Holders.'" SPA13. According to the court, the Agreement also provided that such an act can be taken only by the CVRs' "registered holders." SPA14. Here, the Instrument removing Equiniti and appointing UMB had been executed by beneficial holders rather than registered holders. SPA13. Accordingly, the court held, it was ineffective. SPA13.

The court held that Equiniti, as incumbent Trustee, lacked discretion to deem the signatures of beneficial holders sufficient proof of execution by "Holders." In the court's view, Equiniti's discretion was "limited, by its terms, to only '[t]he fact and date' of the instrument's 'execution.'" SPA14.

The court also rejected UMB's argument that Bristol-Myers had waived any contractual objection and ratified UMB's appointment. The court did not dispute

that Bristol-Myers had affirmatively pronounced UMB the new Trustee, replacing Equiniti. But the court declared that waiver and ratification are "typically affirmative defenses" to claims for breach of contract. SPA17. In any event, the court thought there was insufficient evidence that Bristol-Myers knowingly "relinquish-[ed] a contractual protection." SPA18. The court acknowledged that Bristol-Myers was squarely told that "none" of the Instrument's signatories "were registered holders." SPA18; *see* JA346. But the court suggested that Bristol-Myers remained confused because, elsewhere, Bristol-Myers asked Equiniti to confirm the signatories were "Majority Holders"—a term the court read to refer only to registered holders. SPA16; *see* JA346.

The court then held that the putative departure from the CVR Agreement's appointment procedure deprived the court of subject-matter jurisdiction. According to the court, execution of the Instrument by beneficial holders, rather than registered holders, deprived UMB of "any 'conceivable' injury-in-fact" and thus destroyed "Article III standing." SPA20; *see also* SPA25. The court did not address UMB's repeated argument that any challenge to its appointment was relevant only to the ***non***-constitutional, ***non***-jurisdictional question of whether UMB had ***contractual authority to sue***. SPA20; JA968-70 (Tr. 59:21-60:4, 61:14-20), JA972 (Tr. 63:2-5); *see also* JA213, JA440-41, JA675. The court never acknowledged this Court's observation that, where the complaint identifies a party with Article III standing—

such as the injured CVR holders here, JA32-33 (¶¶20-22)—asking "whether [a] ***nominal*** plaintiff" like Trustee UMB "has standing" is "nonsensical," *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 389 (2d Cir. 2021) (emphasis added). Instead, the court asserted that UMB "concede[d]" that "'only a properly appointed Trustee would have standing to bring' this lawsuit." SPA12 (quoting JA925-26). The court also declined to address whether reconfirmations UMB later obtained could support standing, reasoning that defects in subject-matter jurisdiction "cannot be cured after the fact." SPA26.[3]

### E. Proceedings Since Dismissal

At the district court's suggestion, UMB filed a new lawsuit, this time invoking the reconfirmations. *See* Compl., *UMB Bank, N.A. v. Bristol-Myers Squibb Co. et al.*, No. 1:24-cv-08668-JMF (S.D.N.Y.), Doc.1; *id.* ¶¶122-133. The suit also asserts a claim based on Bristol-Myers' delisting of the CVRs from the New York Stock Exchange and its demand that DTC delete the CVRs from its system—a transparent effort to preclude further shareholder action. Am. Compl., *UMB Bank*, No. 1:24-cv-08668-JMF, Doc.45 ¶152.

---

[3] The court dismissed Bristol-Myers' record-date argument in a footnote, asserting that the argument "ultimately collapses into" whether the Instrument installing UMB was valid. SPA15-16 n.2.

## SUMMARY OF ARGUMENT

**I.A.** The district court held that a purported contractual defect in UMB's appointment as Trustee deprived UMB of the injury-in-fact necessary to support federal subject-matter jurisdiction. But UMB brought this action on behalf of CVR holders. Federal courts routinely entertain suits brought on behalf of injured parties by plaintiffs that have not suffered their own injury-in-fact. In such cases, subject-matter jurisdiction is secure so long as the ***represented*** parties have suffered the constitutionally required injury. Whether the plaintiff has the authority to vindicate those injuries under a contract—here the CVR Agreement—is a ***non***-constitutional, ***non***-jurisdictional question that can be forfeited, waived, or cured after-the-fact.

**B-C.** The CVR holders plainly satisfy each constitutional requirement of standing. They suffered $6.7 billion in damages, traceable to Bristol-Myers' breaches of the CVR Agreement, and redressable by a favorable ruling on the merits in this case. That undisputed injury-in-fact requires reversal. The district court's judgment rests on the mistaken premise that Bristol-Myers' arguments about UMB's appointment as Trustee go to the court's subject-matter jurisdiction. Once that error is corrected, Bristol-Myers' challenge fails as untimely, waived, and mooted by UMB's reconfirmation.

**D.** The district court offered no rationale for its contrary ruling. The court never addressed the well-settled distinction between Article III standing and contrac-

tual authority to sue. It did not address a raft of authority holding that the latter does not implicate the former. Nor did it mention the CVR holders' injury. Instead, the court rested its decision on UMB's purported "concession" that a valid appointment was necessary to "standing." There was no such concession. UMB made crystal clear—in its papers and at oral argument—that Article III's requirements are met here by the injury to holders. UMB's appointment, it explained, is relevant only to ***non***-constitutional, ***non***-jurisdictional "prudential" standing.

**II. A.** Even if UMB's contractual authority to sue were relevant to subject-matter jurisdiction—and it is not—that authority was irrevocably established long before this suit was filed. Bristol-Myers pronounced UMB Trustee with full knowledge of the facts it now claims render that appointment invalid. That gave UMB the authority it needed, ratified its appointment, and waived any objection Bristol-Myers may have had. Indeed, Bristol-Myers, assisted by in-house and outside counsel, worked with Equiniti to review the Instrument appointing UMB, determine what additional evidence was needed to confirm its effectiveness, and scrutinize that evidence when UMB supplied it. Bristol-Myers knew the Instrument was signed by beneficial, rather than registered, holders. And it knew the signatories' holdings had been counted as of an earlier date. It cannot plausibly contend it was confused when it agreed with Equiniti that the appointment was effective.

**B.** Bristol-Myers' acceptance of UMB's appointment also reflected the recognition that the CVR Agreement gave Equiniti discretion to determine whether it had been replaced by UMB. Equiniti's decision to accept an instrument executed by the CVRs' beneficial holders was eminently reasonable. Indeed, Bristol-Myers has since affirmatively argued that beneficial holders of a majority of CVRs ***can*** constitute the "Majority Holders"; Equiniti committed no abuse of discretion in reaching the same conclusion. And the CVR Agreement is replete with provisions that use "Holder" to refer to beneficial rather than registered holders.

**C.** Even if Equiniti had somehow exceeded the bounds of its contractual discretion by deeming beneficial holders' signatures sufficient, that could not justify the drastic step of disregarding UMB's appointment. Equiniti's decision was consistent with industry practice and could not possibly have affected the outcome. The signatories here held their CVRs through DTC, and DTC was legally required to act as they directed. The signatures of ***beneficial*** holders of a majority of CVRs thus necessarily represented what the ***registered*** holders of a majority of CVRs would have done. New York law does not permit a technicality to upend years of reliance that Equiniti, UMB, and all CVR holders put on Bristol-Myers' acceptance of UMB's appointment.

**D.** The district court's own factual findings refute its contrary conclusion. The court found that Bristol-Myers knew the Instrument was not signed by registered

holders and that the signatories had not obtained DTC authorization. Yet the court invoked the fact that Bristol-Myers expressed a desire to conduct "due diligence" and mentioned the CVR Agreement's reference to "Majority Holders" in correspondence with Equiniti. But it is undisputed that Bristol-Myers ***conducted*** that due diligence with Equiniti. And the parties' back-and-forth shows that both Bristol-Myers and Equiniti knew the Instrument was signed by beneficial holders and neither Bristol-Myers nor Equiniti had qualms about accepting beneficial-holder signatures. Reversal is warranted.

## STANDARD OF REVIEW

This Court "review[s] *de novo* whether a plaintiff has constitutional standing to sue." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008). Although contested factual findings are reviewed for clear error, "conclusions of law," findings "based on undisputed facts," and "decisions in which 'the district court engaged in no fact-finding'" are reviewed de novo. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016) (quoting *Mackensworth v. S.S. Am. Merchant*, 28 F.3d 246, 252 (2d Cir. 1994)).

## ARGUMENT

Well before UMB filed this suit, Bristol-Myers announced—in a document signed by its corporate secretary—that the required majority of CVR holders had "removed" the prior trustee "and appointed" UMB as "successor Trustee." JA394.

Time and again thereafter, Bristol-Myers publicly declared UMB "the successor trustee under the CVR Agreement." *E.g.*, JA526. But, years into this litigation, Bristol-Myers changed its tune. It convinced the district court that a supposed contractual defect in UMB's appointment destroyed Article III injury-in-fact and the court's subject-matter jurisdiction.

But Bristol-Myers' argument—and the decision accepting it—rest on legal error after legal error. First, a plaintiff's ***contractual*** authority to sue has no bearing on Article III standing or subject-matter jurisdiction. *See Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242, 244 (2d Cir. 2005). Where, as here, a plaintiff sues in a representative capacity, jurisdiction is secure so long as the represented parties have suffered the constitutionally required injury-in-fact. *See W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 109 (2d Cir. 2008). The CVR holders whose rights UMB seeks to vindicate clearly satisfy that requirement: Bristol-Myers' contractual breaches cost CVR holders $6.7 billion. Bristol-Myers' argument that UMB lacked authority to represent the holders' interests under the CVR Agreement—like any other contractual issue—was not jurisdictional. For that reason alone, reversal is warranted.

Second, even if the issue were jurisdictional, UMB was entitled to bring the suit as Trustee. Before this suit was filed, Bristol-Myers accepted UMB's appointment and announced it to the world, with full notice of all facts underlying its current

objection. In so doing, Bristol-Myers surrendered any objection to UMB's appointment and vested UMB with whatever authority it needed to pursue this litigation. Equiniti properly exercised its discretion under the CVR Agreement to deem UMB's appointment effective. And even if there had been some technical breach of the Agreement's terms, that would not justify disregarding UMB's appointment entirely.

The district court's contrary analysis fails to grapple with decisions of this Court explicitly distinguishing between Article III's injury-in-fact requirement and the ***non***-constitutional, ***non***-jurisdictional question of a party's capacity to sue. The court's contractual analysis is likewise incorrect. And its assessment of Bristol-Myers' conduct defies governing law and the court's own express recitation of the record. Reversal is warranted.

## I. BRISTOL-MYERS' CHALLENGE TO UMB'S CONTRACTUAL AUTHORITY HAS NO BEARING ON SUBJECT-MATTER JURISDICTION

The district court's decision rests on a fundamentally mistaken premise—that a supposed contractual defect in UMB's appointment as Trustee affects ***constitutional standing***. According to the district court, the fact that a majority of "beneficial" rather than "registered" CVR holders approved UMB's appointment somehow forecloses the existence of a justiciable controversy. SPA30. This Court's cases say the opposite. Any defect in UMB's appointment affected, at most, UMB's ***authority*** to sue for CVR holders under the CVR Agreement—a contractual question that has no bearing on federal-court jurisdiction. A case or controversy exists, and the court's jurisdic-

tion is assured, "so long as a party with standing to prosecute the specific claim in question exists at the time the pleading is filed"—***even if*** that party is not the plaintiff. *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 386 (2d Cir. 2021).

Here, there is no dispute that the CVR holders satisfy each constitutional requirement of standing: They suffered an injury-in-fact—to the tune of $6.7 billion—that is traceable to Bristol-Myers' breaches of the CVR Agreement and that would be redressed by a favorable ruling in this case. *See Fund Liquidation*, 991 F.3d at 381. UMB's authority to ***assert*** the holders' rights as "Trustee" has nothing to do with "the requirements found within Article III." *Id.* at 382. "Even allowing a complete stranger to bring suit" on the holders' behalf "would not violate Article III." *T.W. ex rel. Enk v. Brophy*, 124 F.3d 893, 896 (7th Cir. 1997).

### A. A Party's Authority To Sue Under a Contract Does Not Implicate Article III Standing

The district court held that it lacked subject-matter jurisdiction because, in the court's view, UMB's purportedly defective appointment left it without "any 'conceivable' injury-in-fact." SPA20. That analysis fails from the outset. UMB did not sue to redress an injury of its ***own***; it sued to redress injuries to the ***CVR holders***. JA33 (¶22). Those holders' undisputed injuries satisfied the constitutional requirements of standing. *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir.

2020). Whether UMB suffered injury itself has no bearing on the "court's power to resolve the controversy." *Id.* at 212.

The law is clear: Trustees and other representatives do not themselves need to have suffered an injury-in-fact. *See W.R. Huff*, 549 F.3d at 109. "[F]ederal courts routinely entertain" suits by plaintiffs on behalf of injured parties, even when the plaintiffs have "not themselves suffered any injury in fact." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286-88 (2008). "[G]uardians ad litem bring suits to benefit their wards; receivers bring suit to benefit their receiverships; assignees in bankruptcy bring suit to benefit bankrupt estates; executors bring suit to benefit testator estates"; and "[t]rustees bring suits to benefit their trusts." *Id.* at 287-88; *see* 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.9.6 (3d ed. 2008). In such cases, basing jurisdiction on "whether the ***nominal*** plaintiff has standing" is "nonsensical." *Fund Liquidation*, 991 F.3d at 389 (emphasis added). Instead, courts ask whether the ***represented*** party satisfies Article III. *See Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155, 161 (5th Cir. 2016); *Sam M. ex rel. Elliott v. Carcieri*, 608 F.3d 77, 83 n.5 (1st Cir. 2010); *Firestone v. Galbreath*, 976 F.2d 279, 283 (6th Cir. 1992). If it does, the jurisdictional analysis is at an end.

For example, in *Enk*, the Seventh Circuit held that a suit brought on behalf of two children by a "self-appointed" children's "advocate" satisfied Article III because

the suit alleged that the defendants had infringed the "***children['s]***" rights. 124 F.3d at 896 (emphasis added). Although the court ultimately concluded that the plaintiff lacked "capacity to sue," *id.* at 898, it explained that the "question [of] ***who*** shall represent the children" was not an "issue of standing," *id.* at 896 (emphasis added). Given the children's injury, "[e]ven allowing a complete stranger to bring suit in their name . . . would not violate Article III." *Id.*

Similarly, in *Elliott*, the First Circuit rejected a "standing" challenge to foster children's proposed "Next Friends," holding that it was "clear" from "the face of the complaint" that the "***children*** are the real party in interest and their standing to sue has not been challenged in this case." 608 F.3d at 83 n.5 (emphasis added). In *Firestone*, the Sixth Circuit held that the plaintiffs had "standing" to sue as an estate's representatives because their complaint alleged that "***the Estate*** could trace a direct injury to the alleged acts of the defendants." 976 F.2d at 283 (emphasis added). And in *Rideau*, the Fifth Circuit held that parents suing on behalf of their disabled son satisfied Article III because "the standing inquiry" was properly considered "from T.R.'s [their son's] perspective." 819 F.3d at 161.

Here, Bristol-Myers urges that UMB was not properly appointed ***under the CVR Agreement***. But that issue—who may sue on behalf of trust beneficiaries—is likewise "'non-jurisdictional in nature.'" *RACER Tr. v. Nat'l Grid USA*, 10 F.4th 87, 98 (2d Cir. 2021); *see Applestein*, 415 F.3d at 245. Thus, in *Enk* and *Elliott*, the

parties disputed whether the putative representative could sue on the children's behalf. But that dispute did not go to jurisdiction; it was only a question of substantive authority. *Enk*, 124 F.3d at 896-98; *Elliott*, 608 F.3d at 83 n.5. Likewise here. In *Brown v. Keller*, 274 F.2d 779 (6th Cir. 1960), the Sixth Circuit rejected the argument that it lacked subject-matter jurisdiction over a suit brought by former trustees of a pension fund. *Id.* at 780. That the plaintiffs had ceased to be trustees by the time they filed suit was not "a question of jurisdiction," the court explained, "but lack of capacity"—a problem that was readily solved by joining one of the fund's beneficiaries. *Id.*[4] This Court thus has held that a case or controversy exists—establishing the Court's subject-matter jurisdiction—"so long as a party with standing . . . exists" and is identified in the complaint, whether or not it is the named plaintiff. *Fund Liquidation*, 991 F.3d at 386. If that requirement is met, "[e]ven

[4] Rule 17 reflects the same principle. It allows a representative such as an executor, guardian, or a trustee of an express trust to sue in her own name as the "real party in interest," but makes clear that any such representative "action is brought" for the "benefit" of (*i.e.*, to redress injuries suffered by) the represented person. Fed. R. Civ. P. 17(a)(1). Though "[t]he 'standing' label is also sometimes placed on [a] real-party-in-interest challenge . . . there is a key jurisdictional distinction between a challenge that a plaintiff lacks Article III standing and one that she is not the real party in interest." *Norris v. Causey*, 869 F.3d 360, 366 (5th Cir. 2017). "The latter presents a merits question . . . like contractual or statutory standing and does not go to a court's subject matter jurisdiction." *Id.*; *see Fund Liquidation*, 991 F.3d at 380 (citing *Causey* for the "distinction between having standing to pursue a claim and being a real party in interest with respect to that claim").

allowing a complete stranger to bring suit in their name . . . would not violate Article III." *Enk*, 124 F.3d at 896.[5]

The decision below contravenes those principles. It fundamentally conflates contractual authority with jurisdiction. As this Court has observed, terms such as "prudential standing" and "statutory standing" are "somewhat of a misnomer" because they refer to issues that do "not belong to the family of [constitutional] standing inquiries" and do not "implicate subject-matter jurisdiction." *Commerzbank AG v. U.S. Bank, N.A.*, 100 F.4th 362, 383 n.30 (2d Cir.) (internal quotation marks omitted), *cert. denied*, No. 24-104, 2024 WL 4427227 (2024). If statutory and prudential standing do not implicate subject-matter jurisdiction, contractual authority does not either. The district court erred in holding otherwise.

### B. The Undisputed Injury to CVR Holders Satisfies Article III

The question for constitutional standing purposes is thus not whether "nominal plaintiff" UMB suffered Article III injury-in-fact. UMB did not sue to redress injuries of its own. The question is whether the parties UMB purports to represent suffered the requisite injury. It is "clear" from "the face of the complaint" that the CVRs' beneficial holders here suffered serious harm. *Elliott*, 608 F.3d at 83 n.5. The com-

[5] Even where (unlike here) the injured party "is not named in the complaint," that party can later "ratify, join or be substituted into the action"; "[o]nly if" that party "fails to materialize or lacks standing itself should the case be dismissed for want of subject-matter jurisdiction." *Fund Liquidation*, 991 F.3d at 386.

plaint alleges that Bristol-Myers breached provisions of the CVR Agreement that were intended "[t]o protect CVR Holders" in an "attempt to evade its obligation to pay CVR holders" $6.7 billion. JA26(¶5), JA33(¶21). And UMB seeks damages as "Trustee of an express trust for the benefit of the [CVR] holders." JA33(¶22), JA56(¶95), JA58(¶105); *cf. Thole v. U.S. Bank N.A.*, 590 U.S. 538, 542-43 (2020) (injury to trust assets is an injury to trust beneficiaries).

Those allegations amply establish Article III standing. The CVR holders clearly meet each of the "irreducible" requirements of Article III. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). They suffered $6.7 billion in damages, clear " 'injury in fact' "; that injury is " 'fairly . . . trace[able]' " to Bristol-Myers' failure to use diligent efforts in seeking FDA approval; and it is " 'likely' " to be " 'redressed by a favorable decision' " in this action. *Id.* at 560-61. Whether UMB was authorized under the CVR Agreement to assert those claims on the holders' behalf has no bearing on jurisdiction. Given the undisputed injury to the holders, "[e]ven allowing a complete stranger to bring suit in their name . . . would not violate Article III." *Enk*, 124 F.3d at 896. "Article III is satisfied so long as ***a*** party with standing to prosecute the specific claim in question" is identified in the complaint. *Fund Liquidation*, 991 F.3d at 386 (emphasis added). That requirement was met here.

### C. Reversal Must Follow

The district court's decision rests dispositively on the erroneous conflation of contractual authority and Article III standing. Once that error is corrected, the decision must fall—on ground after ground.

Once Bristol-Myers raised its objection, a majority of beneficial CVR holders obtained proxies from DTC reconfirming UMB's appointment (as of both December 9 and December 18). *See* pp. 17-18, *supra*; JA888-89, JA898-99. Under this Court's precedent, that cured any contractual defect in appointment. *See Applestein*, 415 F.3d at 245. The district court refused even to consider reconfirmation on the theory that "Article III standing" must exist "at the time . . . th[e] lawsuit" was filed and "cannot be cured after the fact." SPA26. Because any putative defect in UMB's appointment here has nothing to do with Article III or jurisdiction, that ruling cannot stand.

The district court's treatment of waiver, forfeiture, ratification, and similar doctrines must fall for the same reason. As explained below, Bristol-Myers' conduct ***before*** this suit was filed—telling CVR holders that UMB had been appointed—established UMB's authority before suit was filed. *See* pp. 39-47, *infra*. Even after this suit was filed, Bristol-Myers repeatedly affirmed UMB's appointment, referring to UMB as "successor trustee" in SEC filings and correspondence with the New York Stock Exchange. *See, e.g.*, JA525, JA529, JA533; Compl. Ex. C, Letter from

John Clarke to Elizabeth King, *UMB v. Bristol-Myers*, No. 24-cv-08668 (S.D.N.Y. Nov. 14, 2024), Doc.1-3. It litigated the case for years without ever asserting that a distinction between "beneficial" and "registered" holders deprived UMB of standing.

In any sensible universe, Bristol-Myers would be foreclosed from reversing course so long into the case. But the district court deemed that largely irrelevant for lack of "authority supporting application of waiver or ratification" when the issue is "subject-matter jurisdiction." SPA17. Because the issue here is not jurisdictional but contractual, that rationale cannot stand.

Finally, Bristol-Myers' challenge is untimely in the extreme. Contractual conditions on a plaintiff's right to sue are "threshold defenses" that "must be raised and ***disposed of at the outset*** of the suit." *Applestein*, 415 F.3d at 245 (emphasis added) (internal quotation marks omitted); *see Machne Menachem, Inc. v. Hershkop*, No. 97-cv-2550, 2001 WL 984943, at *3 (E.D.N.Y. July 24, 2001); *Klevanow v. N.Y. Produce Exch.*, 344 F.2d 294, 296 n.1 (2d Cir. 1965). Like objections to a court's personal jurisdiction, defects in a plaintiff's capacity to sue must be raised at the first opportunity under Rule 12(h). *See Swaim v. Moltan Co.*, 73 F.3d 711, 718 (7th Cir. 1996); *De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 878 (9th Cir. 2000). They are waived if "available to the party but omitted" from the pre-answer motion to

dismiss. Fed. R. Civ. P. 12(g)(2); *see* Fed. R. Civ. P. 12(b)(2), (h)(1) & advisory committee's note to 1966 amendment; 5C Wright & Miller, *supra*, §§ 1391, 1394.

Here, there is no dispute that Bristol-Myers had full notice, and access to every relevant document underlying its objection to UMB's appointment, well before this suit was filed. It had the Instrument; it had evidence of the signatories' holdings; and it had in-house and outside counsel reviewing every aspect of the process and advising Equiniti. JA344-47, JA382-93. Yet Bristol-Myers litigated this case for years before filing the motion that was granted below. It had never before raised the registered-holder/beneficial-holder distinction undergirding the decision below; Bristol-Myers did not raise even the record-date argument until its post-motion answer. That was too late.

The plaintiff in *Applestein* was the beneficial holder of securities under a trust indenture like the CVR Agreement. 415 F.3d at 243. At summary judgment, the defendant urged that the plaintiff lacked authorization from the registered holder (as here, DTC). *Id.* at 245. This Court held that the defendant had waived the argument by not raising it at the case's outset. *Id.* That ruling controls here.[6] The district court

---

[6] *Applestein* noted that the capacity defense there was "not raise[d] in [the defendant's] answer." 415 F.3d at 245. But the defendant in *Applestein* never filed a pre-answer motion to dismiss; the answer was the first responsive pleading. *See* Fed. R. Civ. P. 12(g)(2), (h)(1)(A).

erroneously allowed Bristol-Myers to convert an untimely challenge to capacity into an objection to subject-matter jurisdiction that can be raised at any time. SPA11.

### D. The District Court's Contrary Characterization Defies Settled Law

The district court's only apparent basis for treating Bristol-Myers' argument as jurisdictional was its assertion that UMB supposedly "concede[d]" that its only source of "standing" was its capacity as the CVR Trustee. SPA12, SPA20. UMB made no such concession. Rather, the court again conflated two distinct concepts—the "'constitutional limitations on federal-court jurisdiction'" like Article III standing and "'prudential limitations on its exercise,'" which are sometimes called "authority" or "prudential" or "statutory" standing. *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004); *see Commerzbank*, 100 F.4th at 383 n.30 (noting potential for confusion).

UMB was unequivocal—in its papers and at argument—that contractual authority to sue on behalf of CVR holders was at most a "***prudential***" matter that had nothing to do with jurisdiction or Article III constraints. Bristol-Myers' argument, UMB urged, "***does not go*** to subject matter jurisdiction," JA213; "[t]here is ***no*** question of Article III standing here," JA440-41; and "[t]he only question raised by [Bristol-Myers'] motion is ***which*** entity was empowered to act as Trustee"—a "question [that] does not threaten Article III standing," JA675 (emphasis added).

UMB said the same thing at argument. It never "conceded" that the challenge to its appointment as Trustee was a constitutional or jurisdictional issue. Just the opposite. At the outset of the argument, the district court asked UMB's counsel to confirm whether UMB agreed that its "sole conceivable source of standing" was its capacity as the CVR Trustee. JA925-26 (Tr. 16:15-17:2). The court did not specify whether it was referring to non-jurisdictional, "prudential" standing, or jurisdictional, Article III standing. But counsel plainly understood the court to be asking about non-jurisdictional, prudential standing. Although UMB's counsel agreed that appointment was relevant to "standing," counsel went on to explain the issue did not go to subject-matter jurisdiction. In particular, when the court asked whether, given UMB's "conce[ssion] earlier that UMB's only source of standing here is as trustee," a defect in UMB's appointment would mean "[UMB] lacked standing ***in an Article III sense***," UMB's counsel responded unequivocally in the negative. JA968 (Tr. 59:10-13) (emphasis added).

"[T]here's a difference between Article III and prudential standing," counsel explained. JA968 (Tr. 59:21-22). "Article III focuses on having a plaintiff that suffered an injury in fact caused by the defendant that will be redressed by recover[y] [in] the case. Prudential standing addresses raising another person's legal rights." JA968-69 (Tr. 59:22-60:1). Bristol-Myers' appointment challenge, counsel argued, "is a prudential standing issue" because it "relates to the trustee's capacity, its

authority to assert claims for CVR holders." JA968-69 (Tr. 59:21-60:4). But the requirements of jurisdictional, Article III standing were met because the "***CVR holders*** . . . are the injured parties who can obtain redress and have all of the hallmarks of Article III standing in terms of injury and redressability." JA970 (Tr. 61:14-20) (emphasis added); *see also* JA703 ("DTC authority implicates prudential, not Article III, standing.").

The district court never addressed that distinction—or the portions of UMB's briefs making clear that any contractual defect in its appointment would not affect jurisdiction. SPA12, 21. The court disregarded UMB's explanation that the validity of UMB's appointment went only to ***non***-constitutional, "prudential standing." JA968-69 (Tr. 59:21-60:4). It offered no analysis supporting its conclusion that the supposed defect in appointment meant ***UMB*** "lacked any 'conceivable' injury-in-fact, which goes to its Article III standing." SPA20. Nor could it. "[F]ederal courts routinely entertain" suits brought on behalf of injured parties by plaintiffs who have "not themselves suffered any injury in fact." *Sprint*, 554 U.S. at 286-87. Suits brought by "trustees" on "behalf of their trusts" are a paradigmatic example. *Id.* at 287. In such cases, it is the injury to the ***represented*** party—here, the CVR holders—that provides the basis for jurisdiction. Any objection to the Trustee's appointment is a non-jurisdictional challenge to capacity.

## II. UMB Had Authority To Sue Whether Or Not The Issue Is Jurisdictional

Even if UMB's contractual authority to sue were relevant to subject-matter jurisdiction—and it is not—any defect in UMB's appointment was conclusively resolved well before this suit was filed. Bristol-Myers did not merely accept UMB's appointment with full notice of the facts it now invokes to challenge that appointment. Bristol-Myers announced to the CVR holders and the world that UMB had been appointed Trustee. Whether addressed as a matter of waiver, forfeiture, ratification, or de facto trusteeship, the result is the same: UMB was the Trustee, and Bristol-Myers surrendered any right to challenge its status, before this suit was filed. Moreover, the incumbent Trustee, Equiniti, determined that the Instrument appointing UMB was valid. Under the CVR Agreement, that determination was conclusive. And the supposed defects Bristol-Myers identifies are insufficiently material to void UMB's appointment.

### A. Bristol-Myers Endorsed, Ratified, and Waived Any Objection to UMB's Appointment with Full Awareness of the Facts It Now Claims Render That Appointment Ineffective

Six months before UMB filed suit, Bristol-Myers issued a notice—as party to the CVR Agreement—announcing that "holders of not less than 50% of the outstanding CVRs have removed the" incumbent trustee "and ***appointed a successor Trustee, UMB Bank***" under the CVR Agreement. JA394 (emphasis added). That announcement, signed by Bristol-Myers' Corporate Secretary and made with full

knowledge of the relevant facts, vested UMB with all the authority it needed to sue on behalf of the CVR holders.

1. Under the CVR Agreement, replacing Equiniti and installing UMB as its successor required an "act of the Majority Holders." JA75 (§1.4(a)), JA90-91 (§4.10). "Majority Holders" are holders with more than half of the outstanding CVRs "at the time of determination." JA71 (§1.1). Bristol-Myers' argument here is that the Instrument removing Equiniti and appointing UMB was ineffective because it was executed by a majority of "beneficial" holders (the investors who bought CVRs and are entitled to payment), rather than a majority of "registered" holders (here, DTC—an entity that holds 99.9% of the CVRs on behalf of the beneficial holders and cannot act except as they direct). The number of CVRs the Instrument's signatories beneficially held, Bristol-Myers further argues, was measured on December 9, 2020, instead of December 18, when the Instrument was delivered to Equiniti and Bristol-Myers. But Bristol-Myers knew and considered those facts when it received the Instrument. And it accepted and announced UMB's appointment anyway. That vested UMB with the authority of a Trustee, waived any putative defects, and made UMB's status incontestable for Bristol-Myers—all before this suit was filed.

The sequence of events is undisputed. Four days after Bristol-Myers and Equiniti received the Instrument declaring that the CVR holders had removed Equiniti and appointed UMB, Bristol-Myers asked Equiniti to "confirm if UMB did

in fact get the required 50% of CVR holders for the trustee change." JA347. Equiniti responded that it could not "verify the shareholders or the number of shares each holds" because "***[n]one*** of the shareholders listed" on the Instrument "***are registered holders***." JA346 (emphasis added). That statement was unequivocal. "None" means "none." And Bristol-Myers did not have to take Equiniti's word—its in-house and outside counsel received the exact same documentation as Equiniti and knew there had been no effort to obtain registered holder (DTC) authorization. JA387-90; SPA16. Bristol-Myers' 30(b)(6) witness conceded that Bristol-Myers knew "none of the signatories to the instrument of removal were Registered Holders." SPA16.

Yet Bristol-Myers did not tell anyone the Instrument was ineffective. It did not seek an "omnibus proxy," which would direct DTC to hold a vote of beneficial holders. Nor did it request proof that the signatories had received authorization to exercise DTC's nominal rights as registered holder. Instead, Bristol-Myers responded by proposing steps Equiniti might take to confirm that a majority of ***beneficial*** holders had supported appointing UMB, including: (1) asking UMB "to provide all evidence" it had "of the Holders' ownership of CVRs"; (2) obtaining lists of beneficial holders from a third party; and (3) "[r]equesting evidentiary support (account statements or sworn representations)" directly from "the signatories to the Instrument." JA345. None of those things would have helped Equiniti or Bristol-

Myers determine anything about ***registered*** holders; they merely confirmed the extent of the ***beneficial*** holders' holdings.

Bristol-Myers has never disputed that it was told, and knew, that beneficial rather than registered holders had signed the Instrument appointing UMB. It submitted no affidavit, no testimony—nothing—suggesting that it thought the signatories were registered holders, or that it believed they had received authorization from DTC. SPA16. Instead, Bristol-Myers' 30(b)(6) witness admitted that Bristol-Myers "knew that none of the signatories to the instrument of removal were Registered Holders." SPA16.

Bristol-Myers' only argument was that it did not know whether the beneficial-holder signatories had somehow secretly obtained proxies from DTC without telling anyone. Dkt.74 at 18-19. That makes no sense. The only kind of proxy Bristol-Myers' 30(b)(6) witness identified was an omnibus proxy. JA566 (Tr. 68:14-24). And there is no way the holders could have obtained an omnibus proxy without Bristol-Myers' active involvement. *See* Depository Trust Company, Operational Arrangements at 78-79 (2024), https://www.dtcc.com/legal/rules-and-procedures.aspx. Bristol-Myers cannot plausibly claim ignorance of its own conduct. Nor can it plausibly argue it was unaware of facts that were clearly in its possession—including that the signatories were beneficial holders—especially when its in-house and outside counsel were reviewing the evidence UMB provided in real-time and directing

Equiniti to get whatever evidence counsel thought necessary. JA344-45. The district court rejected the notion that Bristol-Myers was confused over whether beneficial holders had obtained proxies from DTC. It found that Bristol-Myers "***knew*** . . . that ***there had been no proxy effort*** at" the time it received the Instrument. SPA16 (emphasis added). Even as the case moved through discovery, Bristol-Myers repeatedly declared UMB was "successor trustee under the CVR Agreement," again and again. *See* JA525, JA529, JA533. It never suggested it had insufficient information.

The record is similar with respect to record dates. Bristol-Myers knew that the Instrument reflected holdings as of December 9, 2020. JA338. And it knew the signatories' holdings had been determined as of December 9, 2020. At Bristol-Myers' request, Equiniti wrote to UMB seeking proof "that the number of CVRs owned by each of those Holders as of December 9 is accurately recorded on the [I]nstrument," so that Equiniti could "confirm that a majority of the Holders have authorized the removal." JA351. UMB provided that evidence and confirmed expressly that the Instrument had the support of a majority as of December 9. JA382.

2. With full knowledge of those facts, Bristol-Myers announced that UMB had been "appointed . . . successor Trustee." JA394. That had consequences under a raft of doctrines.

For starters, "[t]here are few principles of contract law better established, or more uniformly acknowledged, than the rule that when a contract not fully performed

on either side is continued in spite of a known excuse, ***the right to rely on the known excuse is waived***." 13 Williston on Contracts § 39:31 (emphasis added). A "party that continues to perform or accept performance despite the failure of a condition precedent established for its benefit" has "***waived*** the satisfaction of the condition." *Kamco Supply Corp. v. On the Right Track, LLC*, 49 N.Y.S.3d 721, 728 (2d Dep't 2017). Where an obligee accepts performance "with knowledge of or reason to know of the non-occurrence of a condition of the obligor's duty," the obligee undertakes "to perform in spite of that non-occurrence." Restatement (Second) of Contracts § 246 (Am. L. Inst. 1981). The waiving party need not fully understand its "legal rights." *Id.* § 84 cmt.b. Nor is it necessary that the party "intend the legal effect of the" waiver so long as "he has reason to know the essential facts." *Id.*

Here, Bristol-Myers was aware that the Instrument appointing UMB had been executed by beneficial holders holding a majority of CVRs as of December 9, 2020—not registered holders as of December 18, 2020. Bristol-Myers publicly and openly accepted UMB as Trustee anyway, months before this suit was filed. And UMB and the CVR holders proceeded with this case as a result, moving on from providing proof of UMB's appointment to investigating Bristol-Myers' mismanagement of the FDA approval process. Any contractual objection to UMB's appointment was waived.

Ratification likewise forbids a party from "act[ing]" as though a contractual condition has been satisfied and then asserting that it was not, including when the contract otherwise would have been "originally void or voidable." *Rothschild v. Title Guar. & Tr. Co.*, 97 N.E. 879, 881 (N.Y. 1912); *see In re Levy*, 893 N.Y.S.2d 142, 144 (2d Dep't 2010). Though "'negligence is not ratification,'" an affirmative "'act . . . may constitute a ratification, and acquiescence may give rise to an implied ratification.'" *In re Adelphia Recovery Tr.*, 634 F.3d 678, 693 (2d Cir. 2011).

For example, in *Rebecca Broadway Ltd. Partnership v. Hotton,* 143 A.D. 3d 71 (1st Dep't 2016), a party "faced with a breach by the other party" had to choose between "declaring a breach and terminating the contract or, alternatively, ignoring the breach and continuing to perform." *Id.* at 80-81. What the party ***could not do*** was "represent himself as continuing to perform under the contract—and continu[e] to receive the other party's performance in exchange"—while disclaiming reciprocal obligations for the other party's performance. *Id.* at 81. Similarly, in *Richmor Aviation, Inc. v. Sportsflight Air, Inc.*, 918 N.Y.S.2d 806 (3d Dep't 2011), the "parties continued to perform" under the contract despite the fact that, by its terms, the contract had terminated. *Id.* at 808. The defendant, the court held, could not disclaim obligations under the contract after staying silent about its termination for years. *Id.* Here, Bristol-Myers did not merely remain silent—it declared to the world that UMB was the Trustee. There could be no clearer evidence of ratification.

Even a party that was never appointed can be trustee de facto where it performs as trustee without objection. *See, e.g.*, *Murray Bresky Consultants, Ltd. v. N.Y. Comp. Manager's Inc.*, 968 N.Y.S.2d 595, 601 (3d Dep't 2013); *In re Dakin's Will*, 296 N.Y.S.2d 742, 743-44 (N.Y. Surr. 1968). The actions of such a trustee are given full effect. *See, e.g.*, *In re Irrevocable Tr. of McKean*, 183 P.3d 317, 342 (Wash. Ct. App. 2008) (declining to dismiss lawsuit initiated by putative trustee, even when the court that appointed it lacked jurisdiction to do so, because the entity was a "de facto" trustee that "reasonably believed it was the trustee and acted in good faith"); *In re Bankers Tr.*, 403 F.2d 16, 20-21 (7th Cir. 1968) (persons who assumed office of trustee under an election—even if that election did not comply with the trust terms—and acted in good faith were de facto trustees whose action in filing bankruptcy petition "was binding on third persons and [corporation's] stock-holders"); *Crocker-Citizens Nat'l Bank v. Younger*, 481 P.2d 222, 223 (Cal. 1971) (improperly appointed member of trustee committee nonetheless entitled to compensation for service as "[d]e facto member").

Here, moreover, UMB and CVR holders openly relied on UMB's appointment. UMB investigated these claims; it prepared the complaint; and ***all*** CVR holders—whether they signed the Instrument or not—relied on UMB to protect their rights. Equiniti, moreover, relied on the fact it had been removed as Trustee and had been absolved of responsibility to protect CVR Holders. SPA15. Courts find such reliance

highly relevant to ratification, waiver, and the like. *See Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 659 (N.Y. 2006).

Bristol-Myers knew what the CVR Agreement said about removal and appointment of Trustees. Bristol-Myers was told (and saw for itself) that the signatories to the Instrument appointing UMB were not registered holders—Equiniti told Bristol-Myers in plain terms that "***[n]one of the shareholders listed***" on the Instrument "***are registered holders***." JA346 (emphasis added). And Bristol-Myers was expressly notified that the signatories' holdings had been measured as of December 9, 2020—not December 18, 2020 when UMB delivered the Instrument. JA382-84. By accepting and affirmatively endorsing UMB's appointment "[p]ursuant to the provisions of Sections 4.10(c), 4.10(e), and 4.10(f) of the Contingent Value Rights (CVRs) Agreement," JA394, Bristol-Myers vested UMB with all the authority of the Trustee and waived any contractual impediments to that appointment. From that moment on—far before this suit was filed—UMB's authority to sue on behalf of CVR holders was as secure as if UMB had been appointed initial Trustee under the CVR Agreement in the first place.

### B. Equiniti Reasonably Determined, Without Objection, That UMB Was Validly Appointed

Bristol-Myers' decision to accept UMB's appointment made perfect sense in light of the CVR Agreement. As Bristol-Myers recognized, the Agreement empow-

ered ***Equiniti*** to determine whether it had been replaced, and Equiniti reasonably determined that UMB was the new Trustee, without objection or contest. JA387.

1. The CVR Agreement provides that, when input from the "Holders" is required—including for replacing a Trustee under § 4.10—that input "may be embodied in and evidenced by" a written instrument executed by one or more "Holders" or their agents. JA75 (§ 1.4(a)). "Proof of execution" of such an instrument is "***sufficient for any purpose***" under the Agreement and is "***conclusive*** in favor of the Trustee and the Company" if "made in the manner provided" in § 1.4. JA75 (§ 1.4(a)) (emphasis added). The "manner" of proving execution is determined by the Trustee. "The fact and date of the execution by any Person of any such instrument or writing may be proved in any reasonable manner which the Trustee deems sufficient." JA76 (§ 1.4(b)) (emphasis added).

Equiniti exercised its authority to deem the signatures of the CVRs' beneficial holders sufficient to prove "execution" of the Instrument appointing UMB. Under § 1.4(a), that determination was "sufficient for any purpose" under the Agreement—including § 4.10(c), which permits removal of a Trustee by an "act of the Majority Holders." And Equiniti further concluded that the signatories to the Instrument appointing UMB held a majority of outstanding CVRs as of December 9, 2020. JA387-88.

2. To be sure, the "manner" of proof the "Trustee deems sufficient" must be "reasonable." JA76(§1.4(b)). But Equiniti's decision to deem the signatures of beneficial holders sufficient was eminently reasonable. Bristol-Myers itself uses "Majority Holders" to refer to a majority of beneficial holders. In its motion to dismiss UMB's latest suit, for example, Bristol-Myers urged that only "'Majority Holders' as of the [CVR Agreement's] termination date, December 31, 2020—the records for which are available in the DTC system"—are entitled to direct the Trustee. Memorandum of Law at 18, *UMB Bank, N.A. v. Bristol-Myers Squibb Co.*, No. 1:24-cv-08668-JMF (S.D.N.Y.), Doc.52. But the only "records" of holders "available in the DTC System" are records of DTC participant banks and brokerages through which ***beneficial*** holders hold CVRs. JA83(§3.5(b)(ii)). Records of ***registered*** holders are maintained by the Security Registrar—a separate role Equiniti retained after UMB's appointment as Trustee—***not*** DTC. JA82(§3.5(a)). Bristol-Myers' argument thus makes sense only if "Majority Holders" can mean a majority of ***beneficial*** holders.

Equiniti's determination is also consistent with Bristol-Myers' record-date argument. Section 1.4(a) permits Bristol-Myers to "set a record date for purposes of determining the identity of Holders" entitled to vote on or consent to certain proposals. JA75(§1.4(a)). Without a record date, Bristol-Myers contends, there was no way to tell whether the Instrument appointing UMB had the support of a majority.

Dkt.74 at 19. But Bristol-Myers cannot explain how picking a record date could be necessary to "determin[e] the identity" of the majority of ***registered*** holders when it is undisputed that the holder of 99.9% of the CVRs has at all times been DTC.

The Agreement is replete with provisions that use "Holder" the same way. For example, the Agreement prescribes certain rules for "a Holder of a beneficial interest in a Global Security." JA83-84 (§ 3.5(b)(vii)). But a Global Security is a security for which the registered holder is DTC or a successor depositary (or their nominees). JA83 (§ 3.5(b)(i)). If "Holder" always meant "registered holder," those provisions would be incoherent—they would refer nonsensically to a registered holder of a beneficial interest in a security registered to DTC. The Agreement elsewhere requires that "Holders" indemnify the Trustee for actions on their behalf. That makes sense only where "Holders" refers to the "beneficial holders." *See* JA88 (§ 4.2(e)), JA103 (§ 8.6). DTC, a mere placeholder for the beneficial holders, does not pay those costs. The same goes for the provision barring "Holders" from sharing confidential information received from Bristol-Myers. JA99 (§ 7.9). If that provision forbade registered holder ***DTC*** from sharing information, DTC could not share information with beneficial holders, even though beneficial holders must direct DTC how to proceed. Avoiding such absurd results is why the Agreement specifies that its definitions do not control when "context otherwise requires." JA67 (§ 1.1).

Equiniti could not have abused its discretion by adopting an interpretation of "Holder" that reflects Bristol-Myers' own use of that term and is necessitated by the CVR Agreement's text. Even if the scope of Equiniti's discretion was ambiguous, ***both*** parties to the Agreement understood it the same way, resolving any ambiguity through their understanding and subsequent performance. *See Evans v. Famous Music Corp.*, 807 N.E.2d 869, 873 (N.Y. 2004). As the district court acknowledged, Equiniti "subjectively ***believed***" it had been properly removed, SPA15 (emphasis added), and Bristol-Myers "chose to defer entirely to Equiniti" after its inquiries were satisfied, SPA16. Bristol-Myers cannot now claim Equiniti's determination was unreasonable.

3. The lack of a set "record date" does not undermine Equiniti's determination. Section 1.4(a) contemplates a wide range of "acts" by Holders, including "[a]ny request, demand, authorization, direction, notice, consent, waiver or other action provided" for under the Agreement. JA75 (§ 1.4(a)). It contemplates a record date only for "action[s] ***by vote or consent***." JA75 (§ 1.4(a)) (emphasis added). Removing a Trustee is not one of those. Removing a Trustee requires an "***act*** of the Majority Holders," ***not*** a "vote or consent." JA91 (§ 4.10(c)) (emphasis added). And whether holders have the necessary majority depends on whether they hold more than half the outstanding CVRs "at the time of determination"—***not*** as of a "record date." JA71 (§ 1.1), JA91 (§ 4.10(c), (e)).

That makes sense. When Bristol-Myers asks CVR holders to vote on or consent to some proposal, a record date helps ensure that the number of CVRs for or against a measure is not a moving target. By contrast, holders taking action to remove a Trustee can achieve the same result so long as they hold the security and authorize an Act as of the same date—the "time of determination." That is what the beneficial holders did here when they ***signed*** the Instrument on December 9, based on ***their holdings*** as of December 9, 2020. JA382-83.

In any event, Bristol-Myers made a fully informed choice here. Bristol-Myers told Equiniti that it was the incumbent Trustee's responsibility "to make the 'determination' that it has been 'removed . . . by an act of the Majority Holders,'" JA344, and that Bristol-Myers would "look to [Equiniti] as current Trustee for final confirmation regarding the majority ownership needed to change the Trustee," JA387. After having its inquiries satisfied, and receiving what Equiniti received, Bristol-Myers' lawyers told Equiniti: "If [Equiniti] is comfortable moving forward, we will provide our sign-off for distributing the notice to holders noting the change." JA387. Having elected to "sign off" on what Equiniti decided, Bristol-Myers lost the right to contest Equiniti's decision. At the very least, if Bristol-Myers thought Equiniti had abused its discretion in determining UMB was the replacement Trustee, Bristol-Myers had an obligation to timely challenge that decision. Bristol-Myers could not tell Equiniti it would defer, accept Equiniti's determination, announce

UMB's appointment, move to dismiss on different grounds, lose, complete months of discovery, and only ***then*** assert that the appointment was invalid.

### C. The Purported Defects Are Insufficient To Overturn UMB's Appointment

In any event, the purported defects here are the sort of "trivial and innocent" matters that cannot support the drastic remedy Bristol-Myers urges. *Jacob & Youngs v. Kent*, 129 N.E. 889, 890-91 (N.Y. 1921) (Cardozo, J.). For over a century, New York courts have refused to let "'minor, unimportant, inadvertent, and unintentional'" "'deviations'" from contractual requirements void a party's performance—especially where doing so would cause disproportionate harm. *Bank of N.Y. Mellon Tr. Co., N.A., v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 311-12 (2d Cir. 2016). In evaluating materiality, courts consider "factors such as absolute and relative magnitude of default, its effect on [a] contract's purpose, willfulness, and degree to which injured party was benefited under contract." *Id.* at 312; *see Hadden v. Consol. Edison Co. of N.Y.*, 312 N.E.2d 445, 449-50 (N.Y. 1974).

Here, any distinction between "beneficial" or "registered" holders was immaterial. Although DTC formally has voting rights as the party with title to the CVRs, it ***cannot*** exercise those rights except at the direction of the security's beneficial holders. *See* N.Y. Uniform Comm. Code § 8-506. And DTC was registered holder of 99.9% of CVRs. As a result, proof that a majority of beneficial holders supported replacing the Trustee ***necessarily*** meant that UMB's appointment also had

the support of a majority of CVRs registered to DTC. It is thus common practice for indenture trustees to accept direction from beneficial holders without requiring them to go through the time-consuming process of obtaining authorization from DTC first. *See* JA490-91 (Tr. 114:14-115:6), JA500 (Tr. 128:4-24). Equiniti could not materially breach the Agreement by following that practice.

By contrast, Bristol-Myers' proposed remedy imposes grossly disproportionate costs. Bristol-Myers' acceptance of UMB's appointment induced enormous reliance. Equiniti was actively considering "resign[ing] as opposed to waiting for a vote" but held off because "the holders came in with what appeared to be the votes to replace us"; as a result, resigning no longer made "sense." JA480-81 (Tr. 21:4-22:7). UMB, which believed its appointment effective, has spent the last four years vigorously litigating on the CVR holders' behalf. And the holders—who, had they known their choice would be challenged, might have taken further steps to secure UMB's appointment—would be left in limbo without a clear representative. That is exactly the kind of "disproportionate forfeiture" an immaterial breach should not be allowed to cause. Restatement (Second) of Contracts § 229.

### D. The District Court's Contrary Analysis Falls Short of Justification

The district court did not dispute that Bristol-Myers publicly announced, as contractual counterparty, that UMB had been appointed Trustee. *See* pp. 13-14, *supra*. The district court, however, saw "no basis" for applying the familiar

principles of waiver or ratification because, in the court's view, such arguments are "typically affirmative defenses that 'may be pled in defense of claims for breach of contract and breach of trust.'" SPA17. Nor was the court persuaded that Bristol-Myers intended to waive or ratify any objection to the appointment, despite the court's own findings that Bristol-Myers accepted the appointment with full knowledge that the Instrument had been executed by beneficial holders without a DTC proxy. SPA18. That analysis cannot be sustained.

1. *The District Court Was Not Free To Ignore the State-Law Obstacles to Bristol-Myers' Arguments*

The suggestion that doctrines like waiver, ratification, or estoppel cannot be asserted "in opposition to a motion to dismiss for lack of subject-matter jurisdiction," SPA17, is wrong. Even if Bristol-Myers' motion went to subject-matter jurisdiction—it did not—the motion's starting point was a purported contractual defect in the Trustee's appointment. But the same state contract law that allegedly gave rise to that purported defect could also extinguish it before this suit was filed. *See* pp. 39-47, *supra.* Having decided that state-law contractual appointment issues were relevant to subject-matter jurisdiction, the district court had to take that law as it found it. It could not "pick and choose" what aspects of state law it would apply. *Rizzo v. Means Servs., Inc.*, 632 F. Supp. 1115, 1132 (N.D. Ill. 1986); *see also Fund Liquidation*, 991 F.3d at 385 ("state law often defines the legal relationships between

people and things," which can "supply the answers to certain antecedent questions relevant" to standing issues).

The district court's demand that UMB identify authority applying waiver or ratification doctrines in the context of a jurisdictional challenge, SPA17, doubles down on its mistake. There is a reason that arguments about waiver and ratification rarely come up in such disputes: Contractual compliance does not implicate subject-matter jurisdiction. *See* pp. 27-31, *supra*. But if it did, state law could extinguish any such contractual objections before suit at least as surely as it could create them in the first place. Federal subject-matter jurisdiction must exist when the suit is filed. *See Fund Liquidation*, 991 F.3d at 389. That state contract law allegedly imposed a barrier to Article III jurisdiction at some early point in time is irrelevant if, by the time of suit, state contract law has erased that barrier.

The court's suggestion that waiver and ratification are unavailable because they are "affirmative defenses," SPA17, is misplaced. ***Bristol-Myers*** seeks to use a supposed failure to comply with the CVR Agreement's trustee-appointment provisions to defend itself; it invokes that argument to avoid paying damages for having substantively breached the Agreement. If any party is asserting contract principles as an "affirmative defense," it is Bristol-Myers. Indeed, it explicitly raised capacity as an affirmative defense by Answer. JA164-65.

More important, New York courts routinely apply waiver and similar doctrines to defeat such arguments. In *Bank of New York v. BearingPoint, Inc.*, 824 N.Y.S.2d 752 (Table) (N.Y. Sup. Ct. 2006), for example, a party that had dealt directly with "the beneficial Holders" to "discuss[] a possible settlement" and "confirm the identity and requisite percentage ownership of the beneficial Holders" was "estopped from [later] arguing that only Cede & Co." could give notice of default prior to suit. *Id.* at *6. Similarly, in *Rebecca Broadway*, the court affirmed summary judgment for the plaintiff on a breach of contract claim. 143 A.D. 3d at 80. The court acknowledged the defendant's argument that the plaintiff had breached first. *Id.* But the prior breach was no defense because the defendant had continued to accept the plaintiff's performance. *Id.* at 80-81. He could not flip-flop and pretend he was not bound by the contract. *Id.*; *see Lantau Holdings Ltd. v. Gen. Pac. Grp. Ltd.*, 163 A.D.3d 407 (1st Dep't 2018).

The same rule applies here. If there had been some breach of contractual appointment provisions, Bristol-Myers waived that defect, ratified UMB's appointment, and rendered UMB Trustee—surrendering its objection under the same state contract law that gave rise to that objection—before this suit was filed.

2. *The District Court's Own Findings Demonstrate That Bristol-Myers Relinquished Any Challenge to UMB's Appointment*

The district court's view that Bristol-Myers did not clearly manifest an intent to waive its objections is impossible to reconcile with that court's own factual

findings. The court acknowledged that "Bristol-Myers was explicitly told by Equiniti that '[n]one of the shareholders listed are registered holders.'" SPA16. It found that "Bristol-Myers' corporate representative conceded that . . . '[as of December 2020] Bristol-Myers knew that none of the signatories to the instrument of removal were Registered Holders.'" SPA16. The court acknowledged that Bristol-Myers knew that Cede was the registered holder of over 99.9% of CVRs. SPA16. And the court declined to credit Bristol-Myers' argument that it was somehow confused when it accepted the signatures of beneficial holders and somehow might have thought that they had obtained proxies to allow them to act as registered holders. When Bristol-Myers accepted Equiniti's determination that UMB had been appointed, it "knew" "that there had been no proxy effort." SPA16.

Indeed, when Equiniti (at Bristol-Myers' direction) asked UMB for further evidence of the signatories' holdings, UMB sent Equiniti ***and*** Bristol-Myers boxes of "brokerage statements documenting" the signatories' "holdings." JA388. UMB would not have needed to provide brokerage statements if it had been seeking to establish support from ***registered*** holders; Bristol-Myers would have received that information in any omnibus proxy or found it in documentation that accompanies any DTC authorization. JA566 (Tr. 68:14-24). And Bristol-Myers and Equiniti both already knew that the registered holder of the overwhelming majority of CVRs was and had always been Cede. SPA16. After extensive back-and-forth through counsel,

Bristol-Myers publicly accepted UMB as the Trustee anyway. A more obvious instance of waiver or ratification is hard to imagine.

The district court's contrary ruling did not rest on witness testimony, credibility determinations, or similar submissions. Instead, it relied on Bristol-Myers' assertion, in an email with Equiniti, that it wanted to protect UMB's appointment from "'future challenge.'" SPA18 (quoting JA344). (The irony of invoking that statement to allow Bristol-Myers to make precisely such a challenge runs deep.) But Bristol-Myers plainly did not think that relying on the signatures of beneficial holders posed such a risk; otherwise, it would not have approved the appointment. The district court, moreover, overlooked the sentence immediately preceding the language in the email the court invoked. Bristol-Myers' "primary concern," the email explained, was Equiniti's "statements that it 'cannot verify' the holders listed as signatories to the Instrument . . . 'or the number of' CVRs that each of those holders owns"—***not*** Equiniti's far earlier statement that "[n]one of the shareholders listed are registered holders." JA344, JA346 (emphasis added). That's how Equiniti understood Bristol-Myers' statement. It addressed that concern by requesting proof of the signatories' holdings, JA351, which explains why Bristol-Myers signed off on UMB's appointment once that proof was reviewed. District courts cannot ignore such "'conflicting evidence'" without explanation; to do so is

reversible error. *United States v. Willis*, 14 F.4th 170, 189 (2d Cir. 2021); *accord Doe v. Menefee,* 391 F.3d 147, 164 (2d Cir. 2004).

The court's ruling finds no more support in Bristol-Myers' statement, in the same email, that it was Equiniti's responsibility to ensure its removal was made "by 'Majority Holders' rather than by Persons merely purporting to be Holders as of a relevant date." SPA18 (quoting JA344). The court apparently took the view that, because the CVR Agreement describes the "Holders" as registered holders, Bristol-Myers was drawing a registered/beneficial holder distinction. SPA18. But Bristol-Myers also uses "Majority Holders"—in a parallel suit—to refer to a majority of ***beneficial*** holders. *See* pp. 49, *supra.* Regardless, the statement on its face seeks to ensure the signatories actually held CVRs, and held a majority. It does not suggest some unmentioned distinction between registered or beneficial holders. Bristol-Myers sought to determine "the ***number*** of CVRs that each of [the signatories] owns" to ensure the Instrument was backed by a majority, which is why it used the phrase "***Majority*** Holders." JA344 (emphasis added).

Equiniti understood Bristol-Myers' concerns perfectly. It asked UMB for "proof that the Holders who have joined the Instrument were Holders as of December 9, and that the number of CVRs owned by each of those holders" was "accurately recorded on the Instrument." JA351. It did ***not*** ask UMB for "proof" that the holders were registered holders—it knew perfectly well ***they were not***.

JA346. The district court's failure even to address ***any*** of that is reversible error. *See, e.g.*, *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 64 (2d Cir. 1992) (remanding for court to "consider all relevant evidence" where it had "overlooked some relevant evidence in the record").

Regardless, nothing the court cited could conceivably overcome the clarity of the exchanges. Equiniti explained in clear terms that none of the signatories—none—were registered holders; and Bristol-Myers admits that it fully understood that. *See* pp. 41-42, *supra*. This is no case of "mere silence, oversight or thoughtlessness in failing to object." SPA19 (internal quotation marks omitted). Bristol-Myers took pains to establish that it was dealing with an instrument executed by beneficial holders holding a majority of the outstanding CVRs. After thorough review by in-house and outside counsel, Bristol-Myers decided to accept the Instrument on that understanding. When Bristol-Myers moved to dismiss three years later, it identified no facts unknown to it when it chose to defer to Equiniti and to have its corporate secretary sign a notice to all CVR holders that UMB was the new Trustee. Bristol-Myers knew who signed the Instrument. It knew they were beneficial rather than registered holders. And, the district court found, "[Bristol-Myers] ***knew*** . . . there had been no proxy effort" and chose to accept UMB's appointment anyway. SPA16 (emphasis added; citations omitted).

Bristol-Myers cannot accept UMB as Trustee, accept Equiniti's determination, and proclaim UMB's appointment to the CVR holders only to reverse course years later. Equiniti, UMB, and the CVR holders were entitled to take Bristol-Myers at its word and proceed on the understanding that UMB was the duly appointed Trustee. *See Fundamental Portfolio Advisors*, 850 N.E.2d at 658-59; *Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 647 N.E.2d 1329, 1330-31 (N.Y. 1995). Bristol-Myers cannot resurrect objections it definitively relinquished long before this suit was filed by dressing them up as jurisdictional arguments after the fact.

## CONCLUSION

The judgment of the district court should be reversed and the case remanded for further proceedings.

March 13, 2025

Respectfully submitted,

/s/ Jeffrey A. Lamken

Jeffrey A. Lamken
*Counsel of Record*
Eugene A. Sokoloff
Harry Larson
Caroline A. Veniero
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com

Philippe Z. Selendy
Maria Ginzburg
Sean P. Baldwin
Joshua S. Margolin
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9000

David Andrew Crichlow
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, NY 10020
(212) 940-8941

*Counsel for Appellant UMB Bank, N.A., solely in its capacity as Trustee*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Local Rule 32.1(a)(4) because:

_X_ this brief contains 13,913 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), or

___ this brief uses a monospaced typeface and contains ________ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

_X_ this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font, or

___ this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

March 13, 2025 /s/ Jeffrey A. Lamken

# SPECIAL APPENDIX

## SPECIAL APPENDIX – TABLE OF CONTENTS

Page

Opinion and Order Granting Defendant's Motion To Dismiss
for Lack of Subject Matter Jurisdiction (Dkt. 167) ................................ SPA-1

Clerk's Judgment (Dkt. 168) ......................................................................... SPA-33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

UMB BANK, N.A.,

Plaintiff,

-v-

BRISTOL-MYERS SQUIBB COMPANY,

Defendant.

---------------------------------------------------------------------X

21-CV-4897 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

This is a $6.4 billion contract dispute arising out of the November 2019 acquisition by Bristol-Myers Squibb Company ("BMS") of Celgene Corporation ("Celgene"). ECF No. 1 ("Compl."), ¶ 2. In connection with the acquisition, BMS issued to Celgene shareholders contingent value rights, or CVRs, which would have value only if the Food and Drug Administration ("FDA") approved marketing applications for three of Celgene's most valuable products by specified milestone dates. *Id.* ¶¶ 29, 31. If FDA approval of any product came even one day late, the agreement governing the CVRs (the "CVR Agreement") would automatically terminate and the CVRs would be rendered worthless. Compl. ¶ 32; *see* ECF No. 1-1 ("CVR Agrmt."). The Complaint here alleges that BMS, in order to avoid paying CVR holders the $6.4 billion they otherwise would have been due, slow rolled the approval process for one therapy, causing it to be approved thirty-six days after the relevant milestone. Compl. ¶¶ 7, 9, 17. It alleges that BMS breached the CVR Agreement by failing to use "Diligent Efforts" to get the therapy approved on time and by not making its books and records available for inspection upon request on December 29, 2020, as required by the contract. *Id.* ¶¶ 34-35, 85-86.

Case: 24-2865, 03/17/2025, DktEntry: 48.1, Page 79 of 110

Significantly, the lawsuit was not brought by the holders of the CVRs, who were financially harmed by BMS's alleged breach. Under the terms of the CVR Agreement, the CVR holders themselves could *not* sue to enforce the Agreement; *only* the Trustee for the CVR holders under the CVR Agreement could sue. CVR Agrmt. §§ 8.1, 8.4, 8.6. Nor was the lawsuit brought by Equiniti Trust Company ("Equiniti"), the original Trustee named in the CVR Agreement. Instead, it was brought by UMB Bank, N.A. ("UMB"), which purportedly replaced Equiniti as Trustee a few months before filing suit. *Id.* preamble, ¶ 22. The questions presented here are (1) whether UMB was properly appointed as Trustee before it filed the lawsuit and (2) if not, whether that defect deprives UMB of constitutional standing and, thus, deprives this Court of subject-matter jurisdiction. BMS argues that UMB was not properly appointed because, while the CVR Agreement provides that the Trustee can be removed and a successor Trustee appointed by a majority of *registered* CVR Holders, the appointment of UMB and the removal of the initial Trustee were supported by only a majority of the *beneficial* owners of the CVRs. It further argues that this defect deprives the Court of subject-matter jurisdiction and cannot be cured after the fact. By contrast, UMB contends that its appointment was proper either under the plain terms of the CVR Agreement or because BMS knew of the problem yet treated UMB as the Trustee nevertheless. In the alternative, UMB asserts that any defect is curable and, through a "reconfirmation" process that it pursued earlier this year, has now been cured.

For the reasons that follow, the Court agrees with BMS that UMB was not properly appointed Trustee prior to filing suit and that this defect compels dismissal for lack of subject-matter jurisdiction. After three years of litigation and with so much money at stake, the Court does not reach that conclusion lightly. But the CVR Agreement plainly required the support of a majority of registered Holders to effect UMB's appointment, and UMB and those that sought its

appointment — sophisticated parties all — failed to secure that support. That inexplicable failure means that, when this lawsuit was filed, UMB was not the properly appointed Trustee. That, in turn, means that UMB lacked constitutional standing to bring this lawsuit and that this Court lacks subject-matter jurisdiction. To hold otherwise would "carr[y] the [C]ourt[] beyond the bounds of authorized judicial action and thus offend[] fundamental principles" embodied in Article III of the Constitution. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) (citing cases). It would also expose any judgment in the case to the risk of a later collateral attack by disappointed CVR investors. Accordingly, and for the reasons that follow, the case must be and is dismissed for lack of subject-matter jurisdiction. Importantly, however, that dismissal is without prejudice to a new lawsuit by a properly appointed Trustee.

## BACKGROUND

This dispute stems from BMS's November 2019 acquisition of Celgene, a competitor in the pharmaceutical industry. Compl. ¶¶ 2, 28-38.[1] In September 2018, BMS proposed a merger that would result in Celgene becoming its wholly owned subsidiary. *Id.* ¶ 28. On December 27, 2018, in an effort to bridge a gap between the parties as to Celgene's valuation, BMS proposed issuing contingent value rights — or CVRs — to Celgene shareholders as additional consideration for their shares. *Id.* ¶¶ 28-29. A CVR is a security that generally requires the issuer to make a payment to the holder of the security if specified events occur by specified dates. *Id.* ¶ 29. Following months of intense negotiations, BMS and Celgene agreed to a set of terms, which were ultimately memorialized in a merger agreement and accompanying CVR

---

[1] The following summary is drawn from the Complaint, the materials submitted by the parties in connection with the instant motion, and the Court's previous Orders in this case. *See Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010).

Agreement — between BMS and Equiniti, as Trustee for the CVR holders — that became effective on November 20, 2019. *Id.* ¶¶ 30, 36-38.

In brief, the deal involved the issuance of CVRs by BMS that would each provide for a one-time $9 payment if certain "milestones" were met — namely, approval by the FDA of three Celgene products — Liso-cel, Ozanimod, and Ide-cel — by specific dates. *Id.* ¶¶ 30-31. The first such "milestone" deadline, for Liso-Cel and Ozanimod, was December 31, 2020; the milestone deadline for Ide-cel was March 31, 2021. *Id.* ¶ 32. If the milestones for all three products were met, BMS would owe the CVR holders a total of $6.4 billion; if any milestone was missed, the CVRs would expire worthless, and BMS would owe the CVR holders nothing. *Id.* ¶ 32. For its part, BMS was required by the CVR Agreement to "use Diligent Efforts to achieve the Milestone[s]" — with "Diligent Efforts" defined as the "efforts of a Person to carry out its obligations in a diligent manner using such effort and employing such resources normally used by such Person in the exercise of its reasonable business discretion relating to the research, development or commercialization of a product, that is of similar market potential at a similar stage in its development or product life." *Id.* ¶ 34 (quoting CVR Agrmt. §§ 7.8, 1.1).

**A. The CVR Agreement**

Several provisions of the CVR Agreement are relevant here. First, the Agreement provides that only the Trustee is authorized to bring suit in the event of a default. Specifically, Section 8.1 provides that, in the event of a default, "either the Trustee by notice in writing to the Company or the Trustee upon the written request of the Majority Holders by notice in writing to the Company (and to the Trustee if given by the Majority Holders), shall bring suit to protect the rights of the Holders." CVR Agrmt. § 8.1; *see also id.* § 8.4 ("In case an Event of Default has occurred, has not been waived and is continuing, the Trustee may in its discretion proceed to

protect and enforce its rights and the rights of the Holders under this CVR Agreement by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any of such rights . . . ."). Additionally, Section 8.6 — a so-called "no action clause" — provides that, with certain narrow exceptions not applicable here, "no Holder of any Security shall have any right by virtue or by availing of any provision of this CVR Agreement to institute any action or proceeding at Law or in equity or in bankruptcy or otherwise upon or under or with respect to this CVR Agreement." *Id.* § 8.6.

Second, the Agreement includes provisions regarding the resignation or removal of the Trustee and appointment of a successor Trustee. As relevant here, Section 4.10(b) provides that "[t]he Trustee . . . may resign at any time by giving written notice thereof to the Company." *Id.* § 4.10(b). Section 4.10(c) provides that "[t]he Trustee may be removed at any time by an act of the Majority Holders, delivered to the Trustee and to the Company." *Id.* § 4.10(c). And Section 4.10(e) provides, in relevant part, that

> [i]f the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Trustee for any cause, the Company, by a Board Resolution or an action of the chief executive officer of the Company, shall promptly appoint a successor Trustee. If, within one year after any resignation, removal or incapacity, or the occurrence of such vacancy, a successor Trustee shall be appointed by act of the Majority Holders delivered to the Company and the retiring Trustee, then the successor Trustee so appointed shall . . . become the successor Trustee and supersede the successor Trustee appointed by the Company.

*Id.* § 4.10(e). Finally, Section 4.10(f) provides that "[t]he Company shall give notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event . . . to the Holders of Securities as their names and addresses appear in the Security Register." *Id.* § 4.10(f).

Significantly, "Holders" and "Majority Holders" are terms defined in the Agreement. "Holder" is defined as "a Person in whose name a Security is registered in the Security

Register." *Id.* § 1.1. And "Majority Holders" are "Holders of at least a majority of the Outstanding CVRs" at "the time of determination." *Id.* Further, Section 1.4, which governs "Acts of Holders," provides that such acts "may be embodied in and evidenced by one or more instruments . . . signed by such Holders in person or by an agent duly appointed in writing" and that BMS "may set a record date for purposes of determining the identity of Holders entitled to vote or consent to any action by vote or consent authorized or permitted under this CVR Agreement." *Id.* § 1.4. If no record date is set, "the record date . . . shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company." *Id.* Section 1.4 also provides that "[t]he fact and date of the execution by any Person of any such instrument or writing may be proved in any reasonable manner which the Trustee deems sufficient," *id.* § 1.4(b), and that "[t]he ownership of Securities shall be proved by the Security Register. Neither the Company nor the Trustee . . . shall be affected by any notice to the contrary," *id.* § 1.4(c).

Finally, the CVR Agreement contains provisions governing amendments. First, Section 6.1 provides that, "[w]ithout the consent of any Holders, the Company and the Trustee, at any time and from time to time, may enter into one or more amendments hereto or to the Securities, for" several enumerated "purposes," one of which is "to make any other provisions with respect to matters or questions arising under this CVR Agreement; provided, that such provisions shall not adversely affect the interests of the Holders." *Id.* § 6.1. And Section 6.2 provides that, subject to certain restrictions not relevant here, "[w]ith the consent of the Majority Holders, by Act of said Holders delivered to the Company and the Trustee, the Company (when authorized by a Board Resolution or the chief executive officer of the Company) and the Trustee may enter into one or more amendments hereto or to the Securities for the purpose of adding any provisions

to or changing in any manner or eliminating any of the provisions of this CVR Agreement or to the Securities or of modifying in any manner the rights of the Holders under this CVR Agreement or to the Securities." *Id.* § 6.2.

**B. UMB's Purported Appointment as Trustee**

The events relevant to this motion began in or about November 2020, as some CVR investors grew increasingly concerned that BMS would miss one or more of the milestone deadlines. In anticipation of that possibility, and litigation to follow, some CVR investors, UMB, and the existing Trustee, Equiniti, began to discuss replacing Equiniti with UMB as Trustee. *See, e.g.*, ECF No. 77-4 ("Pentwater Dep."), at 98; ECF No. 96-20 ("Equiniti Dep."), at 31. UMB was perceived by some investors to be better suited to bring litigation as a trustee. *See* Pentwater Dep. 85-87; Equiniti Dep. 36, 43; ECF No. 77-2 ("UMB Dep."), at 23-25. On December 9, 2020, Pentwater Capital Management LP ("Pentwater") — a beneficial holder of many CVRs — issued a press release seeking the support of other holders, announcing that Okapi Partners LLC ("Okapi"), a proxy solicitation firm, was coordinating the process. *See* ECF No. 77-11. Okapi apparently deferred to UMB in its belief that securing the support of a majority of *beneficial* CVR holders would be sufficient to effect the substitution. *See* ECF No. 77-5 ("Okapi Dep."), at 65-69. After the Pentwater press release, Okapi received questions about the process, including some about whether the consent of *registered* holders was required. *See, e.g.*, ECF Nos 77-13, 77-14. On December 17, 2020, the Depository Trust Company ("DTC"), which, through its nominee Cede & Co., is the registered holder of over 99% of the CVRs, *see* ECF No. 77-25, reached out to Okapi to inquire whether it would be receiving a consent solicitation notice, *see* ECF No. 77-16. Despite these inquiries, UMB and Okapi persisted in their approach of seeking support only from beneficial CVR holders and, on

December 18, 2020, sent a letter to BMS "notif[ying]" it that "the Holders of not less than 50% of the principal amount of CVRs Outstanding have removed Equiniti as trustee under the Agreement, and appointed UMB Bank, National Association, as successor trustee." ECF No. 77-17, at 2. They enclosed an "Instrument of Removal, Appointment and Acceptance" and the signatures of several investors with substantial CVR positions. *See id.* at 5-242.

In an email dated December 22, 2020, counsel for BMS sought confirmation from Equiniti that UMB had in fact received the required support. ECF Nos. 77-18. Expressing "a number of concerns" about the Instrument purporting to substitute UMB as Trustee, counsel observed: "We are aware that it is [Equiniti's] responsibility, as Trustee, to make the 'determination' that it has been 'removed . . . by an act of the Majority Holders[.]'" *Id.* at 2 (citing CVR Agrmt. §§ 1.1, 4.10(c)). In turn, Equiniti asked UMB to "provide proof that the Holders who have joined the Instrument were Holders as of December 9, and that the number of CVRs owned by each of those Holders as of December 9 is accurately recorded." ECF No. 77-20, at 3. On December 31, 2020, after ignoring Equiniti's inquiries for several days, UMB sent a letter to Equiniti enclosing proof of the beneficial ownership of the investors who had signed the Instrument. ECF No. 77-21; *see also* ECF No. 77-22. Counsel for BMS indicated it would "look to [Equiniti] as current Trustee for final confirmation regarding the majority ownership needed to change the Trustee," ECF No. 77-23, at 3, and, on January 4, 2021, Equiniti issued a "Notice to Holders," signed by BMS, indicating that "not less than 50% of the outstanding CVRs have removed the Trustee, Equiniti Trust Company, and appointed a successor Trustee, UMB Bank, National Association," ECF No. 77-24. As of that date, both BMS and Equiniti believed that UMB had been appointed Trustee. *See, e.g.*, Equiniti Dep. 13; ECF No. 96-12 ("BMS Dep."), at 186. Significantly, DTC did not execute the instrument purporting to effect the

substitution, and no omnibus proxy from DTC was procured. *See, e.g.*, Equiniti Dep. 167; ECF No. 77-2 ("UMB Dep."), at 99-100.

**C. UMB Files Suit**

In the meantime, the Liso-cel milestone deadline passed on December 31, 2020, without FDA approval. Compl. ¶ 78. The next day, BMS announced that — because that milestone had not been met — the CVR Agreement had "automatically terminated" and the CVRs were "no longer eligible for payment." *Id.* ¶ 79. That was true even though FDA approval arrived thirty-six days later. *Id.* ¶ 80. On March 4, 2021, UMB, as "Trustee," notified BMS that BMS was in default under the CVR Agreement "because, among other things, [it] had breached its obligations to use Diligent Efforts to achieve the Liso-cel Milestone and to allow [UMB] to investigate [BMS's] books and records" in connection with that missed deadline. *Id.* ¶ 86; *see* CVR Agrmt. § 8.1 (requiring a notice "specifying [any] default or breach and requiring it to be remedied" to be given "to the Company by the Trustee or to the Company and the Trustee by the Majority Holders," followed by a ninety-day cure period, before suit can be brought). After ninety days passed without BMS curing the alleged defaults, UMB filed this lawsuit on June 3, 2021. Compl. ¶ 86. UMB brings suit "solely in its capacity as Trustee" under the CVR Agreement. *Id.* preamble. The Complaint alleges that, "[o]n December 18, 2020, UMB succeeded Equiniti Trust Company as Trustee of an express trust for the benefit of the holders of CVRs under the CVR Agreement." *Id.* ¶ 22; *see also id.* ¶¶ 95, 105 (alleging that UMB, "as trustee of an express trust for the benefit of the CVR holders, has suffered damages").

On July 23, 2021, BMS first moved to dismiss this case for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 17. After the Court denied that motion, *see UMB Bank N.A. v. Bristol-Myers Squibb Co.*, No. 21-CV-4897 (JMF),

2022 WL 2290609, (S.D.N.Y. June 24, 2022) (ECF No. 33), BMS filed an Answer and discovery commenced. *See* ECF No. 35 (Answer); ECF No. 39 (Civil Case Management Plan). Several months into discovery, BMS first raised the notion that UMB lacked standing because it had not properly been appointed Trustee pursuant to the CVR Agreement. *See* ECF Nos. 61, 63. Thereafter, BMS moved, pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure, to dismiss on that ground, arguing that, at the time this suit was filed, Equiniti had not properly been removed as Trustee and UMB had not properly been appointed as successor Trustee. ECF No. 73; *see also* ECF No. 76 ("BMS Mem."); ECF No. 95 ("UMB Opp'n"); ECF No. 105 ("BMS Reply"). After the motion was fully briefed, UMB alerted the Court to new "record evidence that was unavailable as of UMB's Opposition," namely that "the CVR holders have now obtained proxies from Cede & Co. (the Registered Holder and Nominee for the Depository Trust Company) for UMB's appointment as Trustee as of both December 9 and 18, 2020 — reflecting the will of the CVR holders both then and now." ECF No. 116. The parties submitted supplemental briefs addressing these developments. *See* ECF Nos. 120, 122-24, 128-31. On September 6, 2024, the Court heard oral argument on the motion.

## LEGAL STANDARDS

"[F]ederal courts are courts of limited jurisdiction and, as such, lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir. 2013) (internal quotation marks omitted). Article III of the Constitution "restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.'" *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). "That case-or-controversy requirement is satisfied only where a plaintiff has standing" to bring suit, which requires the plaintiff to "adequately establish," among other things, "an injury in fact

(*i.e.*, a 'concrete and particularized' invasion of a 'legally protected interest')." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). And significantly, Article III standing is a threshold requirement that must be met at the outset of a case. *See Lujan*, 504 U.S. at 570 n.5 ("[S]tanding is to be determined as of the commencement of suit."); *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000))). Separate and apart from *Article III* standing, a plaintiff must generally also have "*prudential* standing," a requirement that "normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Patterson v. Patterson*, No. 20-CV-2552 (PMH), 2022 WL 356513, at *4 (S.D.N.Y. Feb. 7, 2022) (quoting *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 40 (2d Cir. 2015)) (emphasis added).

"The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation." *Lewis v. Bureau of Alcohol, Tobacco & Firearms*, No. 16-CV-1057 (RPK), 2021 WL 2576731, at *2 (E.D.N.Y. June 23, 2021) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006)). Indeed, Rule 12(h)(3) — the basis for BMS's motion here — "requires that '[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.'" *Wells Fargo Bank Northwest, N.A. v. Synergy Aerospace Corp.*, No. 16-CV-8065 (JPO), 2017 WL 3393945, at *2 n.2 (S.D.N.Y. Aug. 7, 2017) (quoting Fed. R. Civ. P. 12(h)(3)). "Motions brought pursuant to Rule 12(h)(3) are subject to the same standards as motions to dismiss for want of subject matter jurisdiction brought pursuant to Rule 12(b)(1)." *Id.* When resolving such a motion, "a district court may refer to evidence outside the pleadings, and the plaintiff bears the burden to

prove subject-matter jurisdiction by a preponderance of the evidence." *Morrow v. Ann Inc.*, No. 16-CV-3340 (JPO), 2017 WL 363001, at *2 (S.D.N.Y. Jan. 24, 2017); *see also Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) ("The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence."). When considering a motion to dismiss for lack of subject-matter jurisdiction, a court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison*, 547 F.3d at 170 (cleaned up).

**DISCUSSION**

UMB makes several important concessions. First, it concedes, as it must, that "only a properly appointed Trustee would have standing to bring" this lawsuit. *See* ECF No. 165 ("Oral Argument Tr."), at 16-17; *see also* UMB Opp'n 13, 21. Second, and relatedly, it acknowledges that its standing (or lack thereof) turns on whether it was (or is) the Trustee because it was not itself a beneficial CVR owner and, thus, it has no independent stake in the controversy. *See* UMB Dep. 91; Oral Argument Tr. 16-17. Third, it admits that the CVR Agreement, by its terms, permitted removal of a Trustee and appointment of a successor Trustee only by an "act of the Majority Holders," UMB Opp'n 13 (quoting CVR Agrmt. § 1.4(c)), and that "Holder" is defined as "a Person in whose name a Security is *registered* in the Security Register," CVR Agrmt. § 1.1 (emphasis added); *see* UMB Opp'n 13; Oral Argument Tr. 17. Fourth, it concedes that the sole instrument purporting to remove Equiniti and install UMB "was endorsed" only "by the CVRs' *beneficial* owners." UMB Opp'n 1 (emphasis added). DTC, which, "through its nominee Cede & Co., [was] the Registered Holder for 99% of the CVRs," neither executed the instrument itself nor provided an omnibus proxy. *Id.*; *see also id.* at 5, 10; Oral Argument Tr. 18-20. And finally,

UMB acknowledges that the CVR Agreement was neither modified nor amended pursuant to the procedures in Sections 6.1 and 6.2. *See, e.g.*, Oral Argument Tr. 47-48; UMB Opp'n 18 & n.4. Despite these concessions, UMB argues that it was "properly appointed as Trustee" prior to filing suit. *See, e.g.*, UMB Opp'n 13-15; Oral Argument Tr. 18, 20-28. In the alternative, it argues that any defect in its appointment could be cured after the fact and has been. *See, e.g.*, UMB Opp'n 23-24; ECF No. 122 ("UMB's Supp. Mem."), at 2-8; Oral Argument Tr. 59-68.

UMB is wrong on both counts.

**A. UMB Was Not Properly Appointed as Successor Trustee**

First, because UMB's appointment was not made by "an act of the Majority Holders" as that term is defined in the CVR Agreement, it was not properly appointed as Trustee prior to filing this lawsuit. UMB asks the Court to disregard the plain language of the CVR Agreement on the grounds that DTC is merely an "intermediary," *see, e.g.*, Oral Argument Tr. 18-19, and that "it is a common industry practice for trustees to accept proof of a majority of beneficial holders' direction of a corporate action, instead of requiring DTC to act as their intermediary," *see* UMB Opp'n 14. But New York law, which governs the CVR Agreement, *see* CVR Agrmt. Ann. B, forecloses this request, as it is well established that "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Cortland St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 39 (2018) (quoting *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 559-60 (2014)); *see, e.g.*, *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 253-55 (2d Cir. 2018) ("New York law requires that we give effect to the plain meaning of the Indenture Agreements' unambiguous terms."); *see also, e.g.*, *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 711 (S.D.N.Y. 2016) (applying New York law and rejecting an interpretation of

Case: 24-2865, 03/17/2025, DktEntry: 48.1, Page 91 of 110

the agreements at issue on the ground that it "ignore[d] the plain language . . . treat[ing] registered holders differently from beneficial owners").

Perhaps recognizing the weakness of this extra-contractual argument, UMB makes two efforts to show that its appointment was proper under the language of the CVR Agreement, but these efforts fall short. First, UMB focuses on Section 1.4 of the CVR Agreement, which outlines the nature of the instrument or writing needed to give effect to any act of the Majority Holders, *see* CVR Agrmt. § 1.4(a), and then provides that "[t]he fact and date of the execution by any Person of any such instrument or writing may be proved in any reasonable manner which the Trustee deems sufficient," *id.* § 1.4(b). Citing this provision, UMB argues that, "[a]lthough the CVR Agreement defines 'Holders' as the CVR's registered holders, it delegates the authority to determine whether an 'act' has the support of the 'Majority Holders' to the existing Trustee" — which, at the time, was Equiniti. *See* UMB Opp'n 13 (internal citation omitted); Oral Argument Tr. 21-24. Equiniti's acceptance of the substitution alone, the argument goes, was therefore sufficient to render the substitution effective. *See* UMB Opp'n 13-15. To the extent that Section 1.4(b) gives the Trustee discretion to make determinations with respect to instruments, however, that discretion is limited, by its terms, to only "[t]he fact and date" of the instrument's "execution." *See* CVR Agrmt. § 1.4(b). Section 1.4(b) did not delegate to Equiniti unchecked authority to determine whether an action constituted "an act of the Majority Holders." Nor did it give Equiniti carte blanche to ignore and override the explicit requirements in Section 4.10 for removal and appointment of Trustees.

Second, UMB points to Section 4.10(e), which, as noted, provides that "[i]f the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Trustee for any cause, the Company, by a Board Resolution or an action of the chief executive

Case: 24-2865, 03/17/2025, DktEntry: 48.1, Page 92 of 110

officer of the Company, shall promptly appoint a successor Trustee." *Id.* § 4.10(e); *see* UMB Opp'n 19. "[W]ith Equiniti stepping out of the picture," UMB contends, "BMS had a duty" under Section 4.10(e) "to appoint a successor Trustee." UMB Opp'n 19. And it should be understood as having exercised that appointment authority — at least "constructive[ly]" — through its "express endorsement of UMB to the CVR holders as the correct Trustee" on January 4, 2021. *Id.* But this argument flounders at each step. For starters, the condition precedent for BMS to appoint a successor Trustee never arose. For the reasons discussed above, Equiniti was not properly "removed" under the terms of Section 4.10. Nor did it "resign." *See, e.g.*, Equiniti Dep. 21-22; *see also* Oral Argument Tr. 25 (UMB's counsel conceding that "Equiniti . . . *didn't resign*" (emphasis added)). Equiniti may have subjectively believed that it had been removed as Trustee, but a subjective belief of removal does not a removal under Section 4.10 make. In any event, BMS cannot be said to have appointed UMB as successor Trustee under Section 4.10(e) because it is undisputed that there was no "Board Resolution or [] action of the chief executive officer" of BMS to appoint UMB. *See, e.g.*, Oral Argument Tr. 15-16 ("The only people involved were an assistant secretary and the corporate secretary."); ECF No. 77-24 (displaying only the signature of a Corporate Secretary on behalf of BMS in its "Notice to Holders" that UMB had been appointed successor Trustee). Here too, accepting UMB's theory would require the Court to "disregard the plain meaning of the . . . Agreement," *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 153 (S.D.N.Y. 2007), and that the Court cannot and will not do.[2]

---

[2] BMS argues that UMB's appointment was defective not only because it was not effected by "an act of the Majority Holders," but also because BMS was never asked to set a "record date for purposes of determining the identity of Holders entitled to vote or consent to any action by vote or consent authorized or permitted under th[e] CVR Agreement." BMS Mem. 18-19; *see* CVR Agrmt. § 1.4(a). But because, as BMS concedes, *see* BMS Mem. 19, the record date defaults to "the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company," CVR Agrmt. § 1.4(a), the argument

Perhaps recognizing the weakness of its contractual arguments too, UMB makes one final stab at defending its appointment as Trustee by invoking the "doctrines of ratification and waiver." *See* UMB Opp'n 16-19. By failing to object to the instrument at the time and then treating UMB as the properly appointed successor Trustee, the argument goes, BMS either waived its right to object to UMB's appointment or ratified that appointment. *See id.* There is, no doubt, some intuitive appeal to this argument, as BMS could have, and arguably should have, recognized at the time that Equiniti's purported removal and UMB's purported appointment were not properly endorsed by "an act of the Majority Holders" within the meaning of the CVR Agreement. For example, in a December 22, 2020 email, BMS was explicitly told by Equiniti that "[n]one of the shareholders listed are registered holders," *see* ECF No. 77-18, at 4, and BMS's corporate representative conceded that, "at th[at] point in time Bristol-Myers knew that none of the signatories to the instrument of removal were Registered Holders," *see* BMS Dep. 116. In the same email chain, BMS expressed its "concern . . . that it 'cannot verify' the holders listed as signatories to the Instrument" and stated that, "[o]n its face, the information provided by UMB is insufficient and requires further verification." ECF No. 77-18, at 2. Further, BMS knew that DTC was the Registered Holder of over 99% of the CVRs, *see* BMS Dep. 107-08, and that there had been no proxy effort at that point, *see id.* at 120. Yet it chose to defer entirely to Equiniti. *See, e.g.*, *id.* 149 ("We relied on Equiniti to make that determination. We asked them if this was enough support and we relied on their determination."); ECF No. 77-23, at 3 (email stating that BMS "would look to [Equiniti] as current Trustee for final confirmation regarding the majority ownership needed to change the Trustee").

---

ultimately collapses into the argument that the instrument purporting to install UMB as Trustee was a not valid "act of the Majority Holders" in the first instance.

Intuitive appeal aside, however, there is no basis to apply either waiver or ratification here. For starters, waiver and ratification are typically affirmative defenses that "may be pled in defense of claims for breach of contract and breach of trust." *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394 (AJN) (BCM), 2016 WL 4613390, at *15 (S.D.N.Y. Aug. 31, 2016); *see also LNC Invs., Inc. v. First Fid. Bank*, 126 F. Supp. 2d 778, 797 (S.D.N.Y. 2001). Tellingly, the portion of UMB's opposition brief addressing waiver and ratification does not — aside from a single paragraph describing the elements of waiver and ratification generally — cite a *single case* supporting application of these doctrines under circumstances like those here. *See* UMB Opp'n 16-19. When pressed at oral argument, UMB's counsel could still offer no authority for its argument, instead purporting to assert that the Court should consider BMS's instant motion to dismiss as the functional equivalent of a breach of contract claim or a claim for recission. *See* Oral Argument Tr. 39-42, 83. But as the Court observed at oral argument, BMS is "asking for dismissal of this suit without prejudice on the grounds that [UMB] lack[s] standing. That's not rescission." *See id.* at 39-40. Nor is there a claim for breach before the Court. Put simply, UMB does not cite, and the Court has not found, any authority supporting application of waiver or ratification under the circumstances here, namely in opposition to a motion to dismiss for lack of subject-matter jurisdiction.

In any event, even if the doctrines of waiver and ratification could apply here as a matter of law, UMB fails to establish that they do as a matter of fact. "A contractual right may be waived if it is 'knowingly, voluntarily and intentionally abandoned,'" but "waiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection." *Luitpold Pharma., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015) (quoting *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset*

*Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006)); *see LNC Invs., Inc. v. First Fid. Bank, N.A. New Jersey*, 173 F.3d 454, 463 (2d Cir. 1999) ("In order to establish that the Bondholders waived their objections to the Trustees' conduct, for example, the Trustees would have to demonstrate, among other things, that the Bondholders effected a 'deliberate, informed abandonment of known rights.'" (quoting 57 N.Y. Jur. 2d Estoppel, Ratification, and Waiver § 84)). And a party asserting a ratification defense must show that the purported ratifier "acted 'with full knowledge of all material facts relating to the transaction.'" *LNC Invs., Inc.*, 173 F.3d at 463 (quoting 57 N.Y. Jur. 2d Estoppel, Ratification, and Waiver § 76)); *see also In re Adelphia Recovery Tr.*, 634 F.3d 678, 693 (2d Cir. 2011) ("The intent required for ratification 'must be clearly established and may not be inferred from doubtful or equivocal acts or language.'" (quoting *Chem. Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 128 (2d Cir. 1999))).

UMB fails to meet these high standards. There is no record evidence evincing any "intent to relinquish a contractual protection" *Luitpold Pharma., Inc.*, 784 F.3d at 95, or "deliberate, informed abandonment of known rights," *LNC Invs., Inc.*, 173 F.3d at 463, made "with full knowledge of all material facts," *id.* at 463. Indeed, the email exchange discussed above reveals that BMS attempted — albeit unsuccessfully and arguably insufficiently — to "ensure that the appropriate due diligence was carried out to avoid any future challenge by any holder to the change in Trustee," and confirmed its understanding that the instrument "be[] delivered by 'Majority Holders' rather than by Persons merely purporting to be Holders as of a relevant date." ECF No. 77-18, at 2. Along similar lines, the email indicating that BMS "would look to [Equiniti] as current Trustee for final confirmation regarding the majority ownership needed to change the Trustee," ECF No. 77-23, at 3, cannot be read as evincing any explicit or implicit intent to agree to a deviation from the requirements of the CVR Agreement. To be sure,

the record might support a conclusion that BMS *should have* known that the instrument removing Equiniti and installing UMB was not sufficient under the CVR Agreement. That, in turn, might be enough to establish carelessness or negligence in relying on Equiniti's determination that adequate proof had been furnished. But "'mere silence, oversight or thoughtlessness in failing to object' is insufficient to support an inference of waiver," *Luitpold Pharma., Inc.*, 784 F.3d at 95 (alteration omitted) (quoting *Courtney-Clarke v. Rizzoli Int'l Publ'ns, Inc.*, 676 N.Y.S.2d 529, 529 (1st Dep't 1998)), and "[w]here the allegedly ratifying party's silent acquiescence to a transaction credibly appears to have resulted from the complexity of the situation rather than intent, ratification does not occur," *In re Adelphia Recovery Tr.*, 634 F.3d at 693-94.

In sum, the instrument purporting to remove Equiniti as Trustee and appoint UMB as successor Trustee was plainly inadequate under the unambiguous terms of the CVR Agreement, and neither waiver nor ratification permits the Court to disregard or alter those terms. It follows that UMB was not the "properly appointed Trustee" at the time it filed this lawsuit and, thus, lacked standing to sue BMS for its alleged default on behalf of the CVR holders.

**B. UMB's Lack of Standing Cannot Be Cured**

That defect mandates dismissal because the absence of standing at the time the lawsuit was filed means the Court lacks subject-matter jurisdiction. *See Lujan*, 504 U.S. at 570 n.5; *see also Davis*, 554 U.S. at 734. "The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Steel Co.*, 523 U.S. at 94-95 (cleaned up). Or as the Supreme Court has long held: "'Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining

to the court is that of announcing the fact and dismissing the cause.'" *Id.* at 94 (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)).

UMB asks the Court to disregard these fundamental and long-established principles, but its arguments on that score fall short. First, relying on *Allan Applestein TTEE FBO D.C.A. Grantor Trust v. Province of Buenos Aires*, 415 F.3d 242 (2d Cir. 2015), and *Lovati v. Petróleos de Venezuela, S.A.*, No. 19-CV-4799 (ALC), 2021 WL 5908953 (S.D.N.Y. Dec. 14, 2021), UMB argues that "where DTC authorization is required to exercise a right under the terms of an agreement such as an indenture, that authorization need not pre-date the exercise thereof, including for the purpose of establishing standing at the time of suit." UMB's Supp. Mem. 1-2 (internal quotation marks omitted); *see also* UMB Opp'n 20-21. But the dispute in *Applestein* and *Lovati* related to prudential, not Article III, standing because the plaintiffs in both cases were beneficial owners of the instruments at issue who had suffered harm; the sole issues were therefore whether, as a matter of contract, they had received authorization to sue. "As beneficial owners, the plaintiffs satisfied Article III standing by sufficiently pleading a legally protected interest at the inception of this case: they alleged a monetary loss, directly traceable to Defendant's alleged breach, redressable by [the] [c]ourt," *Lovati*, 2021 WL 5908953, at *2; *see also Applestein*, 415 F.3d at 245-46. Here, by contrast, "UMB's sole conceivable source of standing . . . is in its capacity as [T]rustee," Oral Argument Tr. 16, and, as discussed, UMB had not been validly installed as successor Trustee when it filed this suit. UMB thus lacked any "conceivable" injury-in-fact, which goes to its Article III standing. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). That is not, as UMB repeatedly insists, "a distinction without a difference," UMB Opp'n 21; Oral Argument Tr. 61. Instead, it is a difference of constitutional proportions.

Second, UMB relies on the Second Circuit's decision in *Fund Liquidation Holdings LLC v. Bank of America Corporation*, 991 F.3d 370 (2d Cir. 2021), to argue that the defect in its appointment before filing suit can be retroactively cured. *See* UMB Supp. Mem. 7-8. *Fund Liquidation Holdings* involved a suit by two Cayman Islands investment funds regarding the manipulation of certain benchmark interest rates. After the suit was filed, the defendants discovered that the two funds "had been dissolved years earlier, and that the case was actually being prosecuted by a separate entity, Fund Liquidation Holdings LLC," which alleged that it had been "assigned the dissolved entities' claims." 991 F.3d at 375. The district court initially permitted Fund Liquidation Holdings to join in its own name pursuant to Rule 17(a)(3) of the Federal Rules of Civil Procedure, which provides that a "court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3); *see Fund Liquidation Holdings LLC*, 991 F.3d at 377. But later, following a challenge by the defendants, the district court dismissed the case for lack of subject-matter jurisdiction on the ground that, because the two funds (the "Dissolved Funds") had "lacked capacity to sue" at the outset, "there was no real 'case or controversy' before the court," and this jurisdictional defect could not be retroactively cured under Rule 17. *See Fund Liquidation Holdings LLC*, 991 F.3d at 377-78.

The Second Circuit vacated and remanded. The Court began by rejecting the defendants' argument that the Dissolved Funds' "pre-filing assignment of their claims stripped [them] of Article III standing," citing the well-established principle that "an assignment does not erase an injury." *Id.* at 380-81 (citing *Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 730-31 (6th Cir. 2016)). "[T]he Dissolved Funds' alleged injury," the Court reasoned, was no less real and "no

less redressable through an award of damages simply because legal title to their claims" had been transferred to Fund Liquidation Holdings. *Id.* at 381. But, the Court concluded, the Dissolved Funds lacked standing because, under Cayman Islands law, they "did not legally exist when the case was filed." *Id.* at 384. "After all," the Court explained, "the most elemental requirement of adversary litigation is that there be two or more parties, meaning that absent a plaintiff with legal existence, there can be no Article III case or controversy." *Id.* (cleaned up).

The Court then turned to "what to make of that fact." *Id.* at 386. The Court explained that the evolution of pleading requirements culminating in Rule 17 revealed, first, that "the rule concerning which party's name a case must be prosecuted under (either the nominal plaintiff or the real party in interest) is non-jurisdictional," and, second, that there is "no constitutional magic behind whether the name of a nominal plaintiff or a real party in interest is initially put in the caption of a pleading." *Id.* at 388. "When viewed this way," the Court continued, "filing a complaint in the name of a deceased or non-existent nominal plaintiff is akin to an error in the complaint's *allegations* of jurisdiction. And it is well-understood that a plaintiff may cure defective jurisdictional allegations, unlike defective jurisdiction itself, through amended pleadings." *Id.* at 388-89 (citing cases). Rejecting the Sixth Circuit's decision in *Zurich Insurance Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir. 2002), that a case started in the name of a plaintiff that lacks standing is a legal nullity, the Court thus held: "Article III is satisfied so long as a party with standing to prosecute the specific claim in question exists at the time the pleading is filed. If that party (the real party in interest) is not named in the complaint, then it must ratify, join, or be substituted into the action within a reasonable time." *Id.* at 386.

The Circuit, applying that holding, concluded that the district court had erred in dismissing the case for lack of subject-matter jurisdiction. Substitution of Fund Liquidation

Holdings for the Dissolved Funds, the Court reasoned, "does not substitute a new cause of action over which there is subject-matter jurisdiction for one in which there is not. Rather, a real party in interest who has been assigned a claim is the functional equivalent of the original plaintiff — an assignee steps into the shoes of the assignor. So even though Fund Liquidation is replacing the Dissolved Funds as the named party, it is prosecuting the *Dissolved Funds'* claims." *Id.* at 389 (cleaned up); *see In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2022 WL 3018104, at *4 (S.D.N.Y. July 29, 2022) (noting that "the dissolved funds [in *Fund Liquidation Holdings*] were plainly asserting their own injuries based on the defendants' manipulation of benchmark interest rates"). Pointedly, the Court also noted that these facts were different from those before the Sixth Circuit in *Zurich Insurance*, "in which the originally named plaintiff never possessed a claim against the defendant." *Fund Liquidation Holdings LLC*, 991 F.3d at 389 n.10 (citing *Zurich Ins.*, 297 F.3d at 532).

This Court recently grappled with the implications of *Fund Liquidation Holdings* and other relevant Second Circuit authority in *Alix v. McKinsey & Co.*, — F. Supp. 3d —, No. 18-CV-4141 (JMF), 2024 WL 3293621, at *7-13 (S.D.N.Y. July 3, 2024). In *Alix*, the plaintiff — Jay Alix — brought claims as the purported assignee of AlixPartners LLP under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1968, against McKinsey & Co. and its various subsidiaries and executives. *See* 2024 WL 3293621, at *1. The Court concluded, however, that the assignment in question did not validly assign AlixPartners LLP's RICO claims to Alix and, thus, that "Alix lacked Article III standing at the time th[e] lawsuit was filed." *Id.* at *5-8. After attempting to harmonize the "confusing, if not internally inconsistent" Second Circuit precedent pertaining to the curability of Article III standing defects, *see id.* at *7-9, the Court concluded that *Fund Liquidation Holdings* did not control and that "the

defect in Alix's suit [was] not amenable to cure," *id.* at *10-12. Because Alix "neither suffered the injury for which he sued nor was assigned the claims he brought by the party that did suffer that injury," it *was*, unlike *Fund Liquidation Holdings*, a case "in which the originally named plaintiff never possessed a claim against the defendant." *Id.* at *10 (quoting *Fund Liquidation Holdings LLC*, 991 F.3d at 389 n.10). For that reason, "the defect in [*Alix* was] not merely a 'technical error in the original pleading's caption' — the type of 'merely formal' error that the *Fund Liquidation Holdings* Court held could be cured under Rule 17(a)(3) without giving offense to Article III." *Id.* (quoting *Fund Liquidation Holdings LLC*, 991 F.3d at 391, 392 n.14). A contrary result would run afoul of Article III, Second Circuit precedent, and the Rules Enabling Act, 28 U.S.C. § 2072, alike. *See Alix*, 2024 WL 3293621, at *10-13.

Applying these principles here, the Court concludes that — as in *Alix* — "the defect in [UMB's] suit is not amenable to cure." *Id.* at *10. UMB filed suit as Trustee under the CVR Agreement, but it "neither suffered the injury for which [it] sued nor was" properly installed as Trustee. *See id.* Here, "the specific claim in question" is a claim by UMB (as it existed at the time of filing) against BMS. *See id.* at *9. But because UMB was not properly installed as successor Trustee at the time of filing, it had suffered no injury vis-à-vis BMS and so that claim is not one over which the federal courts could exercise jurisdiction consistent with Article III. True, as BMS prudently conceded at oral argument, *Fund Liquidation Holdings* rejected the so-called "nullity doctrine," which provides "that a case initiated in the name of a plaintiff that lacks standing is an incurable nullity." 991 F.3d at 386-87; *see* Oral Argument Tr. 51-52. But in *Fund Liquidation Holdings*, the Court noted that "even though Fund Liquidation is replacing the Dissolved Funds as the named party, it is prosecuting the *Dissolved Funds'* claims." 991 F.3d at 389. Here, no party can now step in and prosecute UMB's claims as alleged in this action,

because UMB *had* no justiciable claim against BMS when it filed suit. "Put simply, unlike *Fund Liquidation Holdings*, this *is* a case 'in which the originally named plaintiff never possessed a claim against the defendant.'" *Alix*, 2024 WL 3293621, at *10 (quoting *Fund Liquidation Holdings LLC*, 991 F.3d at 389 n.10)).

UMB misses the point in arguing that, "even if it does implicate Article III standing, the DTC issue is technical and can be corrected through Rule 17(a)(3) under *Fund Liquidation* and this Court's decision in *Alix*." Oral Argument Tr. 59. First, even if one could describe UMB's failure to obtain pre-suit DTC authorization as merely "technical," the deeper Article III problem here is that, due to that failure, UMB did not become Trustee before filing suit and accordingly suffered no cognizable injury-in-fact. The defect in this suit is thus not a "merely formal," "technical error in the original pleading's caption." *Alix*, 2024 WL 3293621, at *10. Instead, it "result[ed] in a party lacking injury-in-fact . . . litigating against Defendant[] in federal court." *Id.* at *11. Second, UMB's argument assumes that Rule 17(a)(3) would permit substitution *of UMB* (post-"reconfirmation" of its appointment of Trustee) *for UMB*. But it cites, and the Court has found, no authority suggesting that Rule 17(a)(3) would permit such a thing.

In any event, to substitute UMB (post-"reconfirmation") as plaintiff in this action — if such a thing were even possible — would require "more than a 'merely formal' alteration of the complaint" and, thus, would exceed the bounds of what Rule 17(a)(3) permits. *Id.* at *10 (quoting *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*, 790 F.3d 411, 424 (2d Cir. 2015)). As the Court explained in *Alix*, "[a]mendments under Rule 17 . . . are 'ordinarily allowed . . . only when a mistake has been made as to the person entitled to bring suit and such substitution will not alter the substance of the action.'" *Id.* (quoting *Cortlandt St. Recovery Corp.*, 790 F.3d at 424). Here, as there, however, a cure would require "more than a 'merely

formal' alteration of the complaint." *Cortlandt St. Recovery Corp.*, 790 F.3d at 424 (quoting *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997)). UMB would not only have to substitute itself for itself, but it would also have to amend its Complaint to reflect — whether explicitly or implicitly — the later-obtained Cede & Co. authorization (assuming *arguendo* that such authorization is valid) and to address various allegations about UMB's actions "as Trustee" before filing suit. *See, e.g.*, Compl. ¶¶ 15, 86, 92-93, 96-105. "Such an amendment would not be 'consistent with Rule 17(a)(3).'" *Alix*, 2024 WL 3293621, at *10 (quoting *Cortlandt St. Recovery Corp.*, 790 F.3d at 423); *see Fund Liquidation Holdings LLC*, 991 F.3d at 392 n.14 (citing *Cortlandt Street Recovery Corp.* for the proposition that Rule 17 limits the scope of permissible amendment to the "merely formal").[3]

In short, UMB's lack of Article III standing at the time it filed this lawsuit cannot be cured after the fact. Accordingly, the Court need not and does not decide whether Cede & Co.'s purported post hoc approval effectively installed UMB as successor Trustee because — even if it did — that could not and would not vest the Court with subject-matter jurisdiction over this case. Instead, the Court is compelled to, and does, dismiss the case without prejudice for lack of subject-matter jurisdiction. *See, e.g.*, *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 735 (2d Cir. 2017) ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice.").

---

[3] The *Fund Liquidation Holdings* Court suggested that "more substantive amendments" might be permissible "through a motion made jointly under both Rule 15 *and* Rule 17." 991 F.3d at 392 n.14. But it did not take a position on the issue. *See also id.* at 390 (noting that the Court had "never taken a position on" whether Rule 15(d) could be used to cure a jurisdictional defect that existed at the time of the initial filing and declining to do so there). Neither does the Court here, as UMB has not relied on Rule 15 or any "other rule of civil procedure . . . . It has relied upon only Rule 17." *Cortlandt Street Recovery Corp.*, 790 F.3d at 424-25.

**C. Sealing**

One housekeeping matter remains. The parties filed a slew of letter motions to seal portions of their motion papers and supporting exhibits. *See, e.g.*, ECF Nos. 72, 94, 102, 107, 111, 115, 121, 127, 133, 136, 161. The Court granted these letter motions temporarily, noting that it would assess whether to keep the materials at issue sealed or redacted when deciding the underlying motion. *See, e.g.*, ECF Nos. 78, 99, 108, 109, 119, 126, 132, 138, 164.

It is well established that filings that are "relevant to the performance of the judicial function and useful in the judicial process" are considered "judicial documents" to which a presumption in favor of public access attaches. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). More specifically, a three-part test applies to whether documents may be placed under seal. First, "a court must . . . conclude that the documents at issue are indeed 'judicial documents' . . . and that therefore a common law presumption of access attaches." *Id.* at 119. Second, the court "must determine the weight of that presumption," which is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* (internal quotation marks omitted). "Finally, . . . the court must balance competing considerations against" the presumption of access, including "the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure." *Id.* at 120 (internal quotation marks omitted). The party or parties seeking to maintain information filed under seal bear "the burden . . . to demonstrate that the interests favoring non-access outweigh those favoring access." *United States v. Amodeo*, 44 F.3d 141, 148 (2d Cir. 1995).

Here, the parties seek to seal (or redact) three principal categories of documents and information: (1) "personally identifying information of non-party CVR holders and their

investment amounts," *e.g.*, ECF No. 136, at 3; (2) the so-called "Merits Discovery Materials," ECF No. 107; *see also* ECF No. 136; and (3) documents pertaining to UMB's efforts to become Successor Trustee, *see* ECF No. 75 (and attached exhibits).[4] The Court will address each in turn.

First, any references to "personally identifying information of non-party CVR holders and their investment amounts" may remain redacted because they are not relevant to the Court's resolution of the present motion and the "privacy interests of innocent third parties" sufficiently outweigh any presumption of access afforded to these filings. *See City of Providence v. BATS Glob. Mtks., Inc.*, No. 14-CV-2811 (JMF), 2022 WL 539438, at *2 (S.D.N.Y. Feb. 23, 2022) (quoting *Amodeo*, 71 F.3d at 1050); *see also SOHC, Inc. v. Zentis Sweet Ovations Holding LLC*, No. 14-CV-2270 (JMF), 2014 WL 5643683, at *5 (S.D.N.Y. Nov. 4, 2014) (finding the presumption overcome with respect to redactions "limited to specific 'financial figures and customer information' . . . , which are not relevant to the parties' legal dispute and implicate legitimate privacy interests").

Second, because the Court was presented here only with the threshold jurisdictional question (and found that it lacks jurisdiction), the Court agrees with BMS that the Merits Discovery Materials, and the portions of the parties' briefing referring to them, are not technically "judicial documents." "A document is relevant to the judicial function if it is *currently* relevant to the judicial function, not if it '*could* later become relevant to the judicial function.'" *Beach v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 17-CV-563 (JMF), 2019 WL 2428631, at *10 (S.D.N.Y. June 11, 2019) (quoting *United States v. HSBC Bank USA, NA*, 863

[4] Aside from these categories of materials, non-party Pentwater represents that it "has no objection to [a page of a deposition transcript of its founder and CEO] being filed publicly so long as the prior page is file publicly . . . as well." ECF No. 133, at 1. Because Pentwater attached both pages to its letter, filed publicly, *see* ECF No. 133-1, the issue is moot.

F.3d 125, 140 (2d Cir. 2017)). The facts relevant to the merits of the parties' dispute — for example, the facts surrounding the Liso-cel application process — had no bearing on the jurisdictional question decided here. It follows that, "at this time, [the Merits Discovery Materials] are not properly considered judicial documents." *Id.*; *see also In re IBM Arbitration Agreement Litig.*, No. 21-CV-6296 (JMF), 2022 WL 3043220, at *2 (S.D.N.Y. Aug. 2, 2022) (holding, where the Court had granted IBM's motion for judgment on the pleadings, that materials submitted by the plaintiffs in connection with a cross-motion for summary judgment were not properly considered "judicial documents" because they "had no 'tendency' — or, for that matter, ability — 'to influence [this Court's] ruling on [IBM's] motion'" (alterations in original)), *aff'd*, 76 F.4th 74 (2d Cir. 2023).

In the alternative, to the extent these materials could be considered "judicial documents," "the weight of any presumption is limited" given that "the Court did not need to reference or otherwise rely on" the materials. *In re Accent Delight Int'l, Ltd.*, Nos. 16-MC-125, 16-MC-50 (JMF), 2018 WL 2849724, at *6 (S.D.N.Y. June 11, 2018). On the flip side, the interests BMS asserts in favor of maintaining these materials under seal — including the risks of "competitive harm" and misleading the public about Liso-cel — are not insignificant. Accordingly, the Court finds that the Merits Discovery Materials are not "judicial documents" entitled to a presumption of public access or, in the alternative, are entitled only to a minimal presumption that is sufficiently overcome, and thus may remain in sealed or redacted form. The same is true for the Prepaid Forward Agreement, which UMB requests to maintain under seal. *See* ECF No. 72.

By contrast, the Court concludes that the third category of materials — those pertaining to the process through which UMB attempted to become Successor Trustee, including any currently sealed excerpts from the parties' filings that are quoted or cited in this Opinion and

Order — must be unsealed. These materials go to the heart of the threshold question of whether UMB actually became the Successor Trustee, which — as the Court has explained — ultimately disposes of this motion and this case. Accordingly, the presumption of public access is strong with respect to these documents, and the parties have not offered any adequate justification for maintaining them under seal altogether. Accordingly, the parties are directed to confer (including with relevant non-parties who may have designated certain materials confidential) and file on the public docket all exhibits to the Declaration of John J. Clarke, Jr. at ECF No. 75 (and currently under seal at ECF No. 77) that are currently sealed, with any proposed redactions — and a letter explaining the need for such redactions — **within two weeks of this Opinion and Order**. Okapi has already done so with respect to certain exhibits, and the Court agrees that its proposed redactions are justified, substantially because they fall under the umbrella of private third-party information. *See* ECF No. 111.

If any party believes there are additional materials that should be unsealed that the Court did not address here, it shall file a letter motion **within a week of this Opinion and Order** explaining the basis for that belief and pointing the Court both to the materials in question and the parties' previous arguments regarding such materials, if any.

## CONCLUSION

For the foregoing reasons, UMB's claims must be and are dismissed for lack of subject-matter jurisdiction. UMB was not validly appointed as successor Trustee under the CVR Agreement before it filed the lawsuit, so it lacked Article III standing at the time it filed suit — a jurisdictional defect that cannot now be retroactively cured. Although "[a]t first glance, that result may smack of a technicality," in fact "it is no mere technicality." *Alix*, 2024 WL 3293621, at *13. Put differently, "[m]uch more than legal niceties are at stake." *Steel Co.*, 523 U.S. at

101. The demands of Article III standing "serve[] to safeguard fundamental principles of adversary litigation, fairness to litigants, and judicial modesty" and, more broadly, "implement[] 'the Framers' concept of the proper — and properly limited — role of the courts in a democratic society.'" *Alix*, 2024 WL 3293621, at *14 (quoting *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 379-80 (2024)); *see also Murthy v. Missouri*, 144 S. Ct. 1972, 1985 (2024) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." (cleaned up)). Moreover, any judgment reached in this suit would be exposed to the risk of later collateral attack by disappointed CVR investors based on UMB's lack of standing to bring suit. In any event, the Court has no choice but to dismiss. And UMB has no one to blame for that result but itself.

Significantly, however, this dismissal is *without prejudice* to the refiling of a new lawsuit by a properly appointed Trustee. *See, e.g.*, *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54-55 (2d Cir. 2016) ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice."); *see also* Oral Argument Tr. 12, 72 (BMS conceding that a properly appointed Trustee could refile suit following dismissal and that the statute of limitations has not yet run). To be sure, any new lawsuit would likely have to confront the question of who the Trustee is now — namely, whether it is still Equiniti or, as a result of the "reconfirmation" process earlier this year, whether it is *now* UMB. But that is a question for another day.[5] For now, it suffices to say that UMB cannot maintain *this* suit.

---

[5] In the event that a new lawsuit is filed in this District, the plaintiff in that lawsuit should designate it as related to this case in accordance with the Court's Local Rules and Rules for the Division of Business Among District Judges. Assuming that any such new lawsuit were to survive jurisdictional challenge, the Court would likely pick up where this case left off in terms of motion practice, discovery, and the like.

Accordingly, BMS's motion to dismiss for lack of subject-matter jurisdiction must be and is GRANTED. The Clerk of Court is directed to terminate ECF No. 73 and to close the case.

SO ORDERED.

Dated: September 30, 2024
New York, New York

JESSE M. FURMAN
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
UMB BANK, N.A.,

Plaintiff,

-against-

21 **CIVIL** 4897 (JMF)

**JUDGMENT**

BRISTOL-MYERS SQUIBB COMPANY,

Defendant.
-----------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated September 30, 2024, BMS's motion to dismiss for lack of subject-matter jurisdiction must be and is GRANTED; accordingly, the case is closed.

**Dated:** New York, New York

September 30, 2024

**DANIEL ORTIZ**

**Acting Clerk of Court**

**BY:** Nelson Duld

**Deputy Cler'-**